[L.A. No. 29715. In Bank. May 13, 1970.]

DELMA GRUDT, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Belli, Ashe, Ellison, Choulos & Cone, Irmas, Simke, Rutter, Green, Lasher & Hecht, Melvin Belli, David Manning Chodos, Sydney M. Irmas, Jr., and Harvey A. Schneider for Plaintiff and Appellant.

Roger Arnebergh, City Attorney, and John A. Daly, Assistant City Attorney, for Defendants and Respondents.

## OPINION

MOSK, Acting C. J.—On February 24, 1965, John Grudt was shot and killed by two Los Angeles police officers. Mrs. Delma Grudt, his widow, brought a wrongful death action for damages against the two officers and the City of Los Angeles. After a jury verdict for defendants, plaintiff appeals.[1]

On the night of the shooting at 12:15 a.m., John Grudt, a 55-year-old carpenter who was slightly hard of hearing, was observed by two plain-clothes police officers as they drove an unmarked blue 1960 Plymouth four-door sedan without siren or red light. Grudt was driving northbound on Western Avenue at about 35 to 40 miles per hour and narrowly missed running down two women in the crosswalk. The officers determined to stop Grudt for questioning because he was driving in a high crime area, but they did not intend to arrest him for traffic violations. They pulled along the side of Grudt's moving car, and the officer on the passenger side raised his badge, shined his flashlight on it, and shouted "Police Officer. Pull Over." Grudt continued driving and turned right at the next corner with the officers in pursuit. The officers again pulled alongside, the passenger showed his badge, and the driver flashed his bright lights and sounded his horn, but Grudt did not yield. Grudt made two more right turns and returned northbound on Western Avenue. The officers became alarmed when Grudt was seen to reach under the front seat of his car, although he did not exhibit any weapon.

Two other plainclothes policemen, Officers Kilgo and Rinehart, driving an unmarked 1961 pink-beige Dodge four-door sedan, heard a police broadcast that plainclothes officers were pursuing a 1959 green and white Ford northbound on Western Avenue. According to Officer Kilgo's testimony, he and Rinehart positioned their vehicle partially across Western Avenue at the intersection of 22d Street, and Officer Rinehart waved a red light to alert oncoming traffic. Grudt's vehicle and another unidentified vehicle just ahead stopped at the intersection, where there were no traffic signals. Officer Kilgo alighted from his vehicle and loaded his double-barreled shotgun as he approached Grudt's car. The other car drove away and Kilgo tapped loudly on the closed left front window of Grudt's car with the muzzle of his shotgun. Grudt looked at Kilgo and "was surprised and appeared to be frozen to the wheel." Kilgo, realizing Grudt might have been frightened at seeing him without his uniform and carrying a shot-gun, lifted his shotgun in the air, leaned forward and pointed to his badge

---

[1]The transcript in this case covers more than 1,500 pages; therefore, our summary of the evidence is necessarily selective.

displayed on his left front pocket. Thereupon, Grudt turned his wheels toward the left and accelerated his car. The car brushed Kilgo back and he feared that it was heading towards Officer Rinehart, who was standing in front and to the left of the Grudt car. Kilgo fired a shotgun blast through the left rear window of the vehicle. Rinehart testified that Grudt's vehicle struck his leg and that he jumped to his right and fired four rounds from his revolver into the left front window. About three seconds elapsed from the time that Kilgo saw Grudt "frozen to the wheel" to the moment of the shots.

Grudt died within seconds of the shooting. It was undisputed that, after the shooting, Grudt's vehicle was at rest at the south side of a pedestrian crosswalk at the intersection of a Santa Monica freeway on-ramp and Western Avenue, about three car-lengths north of the 22d Street intersection. The car was pointing northward and was about six feet away from the curb to the east. There was a working traffic signal at the on-ramp intersection. At the time of the shooting, black and white marked police vehicles were converging on the area from both the north and the south.

Despite a thorough investigation after his death, no evidence of any crime committed by Grudt was uncovered. His wallet containing less than five dollars was found under the front seat, where he had apparently placed it during the chase. Grudt did not drink and had no previous criminal record.

Edward A. Plankers, a meatcutter, testified for plaintiff and contradicted the officers' version of the shooting. He was on his way home from work and was driving north on Western Avenue in the left-hand lane. He stopped for a red traffic light at the intersection of the on-ramp to the Santa Monica freeway, about 40 feet north of 22d Street. Grudt's car stopped abreast of his car and to his right. Plankers was emphatic that neither he nor Grudt stopped at the intersection of 22d Street. Just before the light changed, Plankers saw a man with a shotgun coming toward them and he "didn't know what to think." He started off when the light changed and had not gone far when he heard a shot. He had looked back in his rearview mirror as he drove off, and he testified that Grudt's car did not move before the shot was fired. Plankers' testimony was partially corroborated by the testimony of James Graves, who was on foot on the freeway overpass at the time of the shooting. He saw Kilgo approaching with the shotgun; he saw another car that had been beside Grudt's car speed away; and he saw police cars approaching. He dropped to the ground when he heard the shots.

Dr. LaJoie, an internist specializing in cardiology, testified as an expert for plaintiff. Based upon the autopsy report, he opined that death was

caused by the shotgun blast. It was his testimony that Grudt suffered an immediate paralysis and could not thereafter have engaged in any useful activity. William Harper, a consulting physicist, also testified for plaintiff. Based upon his examination of the 1959 Ford driven by Grudt the night he was killed and the officers' testimony as to where Grudt stopped and where Officer Rinehart was standing, Harper concluded that the steering wheel of the Grudt vehicle would have required more than two and a half complete turns to its maximum left position in order to strike Rinehart. After such a turn, it was Harper's opinion that the vehicle could not return to a parallel position of the kind that it admittedly occupied after the shooting without some human intervention.

## I

Plaintiff makes three separate specifications of error by the trial court. ■ First, she contends it was error to strike the second cause of action of her first amended complaint. Plaintiff's original complaint in the action was filed on September 7, 1965, and alleged that Officers Kilgo and Rinehart were employees of the City of Los Angeles and had intentionally and wrongfully shot her husband to death. On July 5, 1966, the law and motion department granted plaintiff's motion filed a month earlier to amend her complaint to state a second cause of action against the City. In the second cause of action, she alleged that the City was negligent in continuing to employ Officers Kilgo and Rinehart after it knew or should have known that they were dangerous and violent officers, prone to the use of unnecessary physical force. On the opening day of the trial, defendants moved to strike the second cause of action on the ground that plaintiff had sought to amend her complaint after the one-year statute of limitations had run. The trial judge granted the motion.

■ The prevailing rule with respect to actions involving parties designated by their true names in the original complaint is that, if an amendment is sought after the statute of limitations has run, the amended complaint will be deemed filed as of the date of the original complaint provided recovery is sought in both pleadings on the same general set of facts. (*Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 600 [15 Cal.Rptr. 817, 364 P.2d 681].) ■ It is conceded that plaintiff amended her complaint after the statute of limitations had run and, therefore, the only question is whether the trial court correctly determined that the second cause of action in plaintiff's amended complaint did not seek recovery on the same general set of facts contained in the initial complaint. We conclude that the court erred.

No doubt plaintiff's second cause of action added a significant new di-

mension to the lawsuit. Not only was it asserted that the City was liable as the employer of negligent employees on a *respondeat superior* theory, but it was also claimed that the City was liable for its own negligence in retaining the services of officers known to be dangerous. However, the *Austin* rule requires only that the original and amended pleadings seek recovery "on the same general set of facts" (*id.* at p. 600), and plaintiff's amended complaint in the instant action would appear to meet that test.

Although no California authorities deal with the precise question at issue, plaintiff finds support by way of analogy to several cases. In *Weinstock* v. *Eissler* (1964) 224 Cal.App.2d 212 [36 Cal.Rptr. 537], plaintiff was permitted, after the statute of limitations had run, to add a cause of action for fraud to a complaint alleging negligent and intentional tort by a physician in the performance of an operation. "While count three [for fraud] sets forth certain facts, not found in the preceding two counts, which assert in essence the inducement of plaintiff's consent to the operation by false representations on the part of the defendant, these additional facts do not set forth a wholly distinct and different obligation. They do no more than express a change of the legal theory underlying the original complaint. The defendant's act for which plaintiff seeks recovery is the same—the performance of the cerebral angiogram and spinal tap. The primary right for the violation of which he seeks recovery is the same—the wrongful invasion of his body although its statement now appears in terms of fraud. Nevertheless, realistically examined, the allegations relating to defendant's false representations and plaintiff's reliance thereon are prefatory to the central allegations of the count, namely defendant's performance of the operation and plaintiff's resulting injuries." (*Id.* at pp. 234-235.)

By parity of analysis, both counts in the amended complaint before us recite the same acts by Kilgo and Rinehart as the gravamen of the action, and recovery is sought in both counts to compensate plaintiff for the loss of her husband. Just as defendant's false representations and plaintiff's reliance were additional, though incidental, facts in *Weinstock,* so the officers' prior dangerous conduct and the City's knowledge thereof are additional facts in this case which do not involve a significantly distinct cause of action.

*Garrett* v. *Crown Coach Corp.* (1968) 259 Cal.App.2d 647 [66 Cal. Rptr. 590] is also persuasive authority on this subject. In *Garrett,* a complaint charging a driver, his employer, and several Doe defendants with negligence in an automobile collision was amended to add a cause of action against the manufacturer of the vehicle causing the accident. "[P]laintiff is seeking to hold Crown legally responsible for the same accident and the same injuries referred to in the original complaint. The amendment changes

the alleged obligation of 'Doe One' from that of an operator to that of a manufacturer. This is no more drastic than the change of theory reflected by the amendment in *Austin*." (*Id.* at p. 651.) The addition here of a cause of action for negligent retention of dangerous employees to an action based upon employment of intentionally tortious employees is much less formidable as an amendment than that approved in *Garrett*. (See also *Wennerholm* v. *Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713, 718 [128 P.2d 522, 141 A.L.R. 1358].)

 It would appear, therefore, that the trial court took an unduly rigid approach to a pleading rule "which, in furtherance of the policy that cases should be decided on their merits, gradually broadened the right of a party to amend a pleading without incurring the bar of the statute of limitations." (*Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) *supra,* 56 Cal.2d 596, 600.) The trial court erred in granting defendants' motion to strike plaintiff's second cause of action.

## II

After presentation of plaintiff's case in chief and after the defendants had produced six witnesses, defense counsel made a motion to exclude from the issues to be given to the jury the question of the negligence of Officers Kilgo and Rinehart in the shooting which resulted in Grudt's death. Counsel also moved the court to strike from the evidence the police tactical manual on the use of firearms. The trial court granted both of these motions, and plaintiff's second contention is that the court thereby committed reversible error.

 We note at the outset that whether acts or omissions of Kilgo and Rinehart constituted negligence was an issue properly raised before the trial court. While it is conceded that plaintiff's complaint alleged only that the officers intentionally and wrongfully killed decedent and did not allege negligence on the part of the officers, the pretrial conference order filed in the case recited the negligence of the officers as an issue to be tried.[2]
 When filed, the pretrial conference order becomes a part of the record in the case and, even though inconsistent with the pleadings, controls the subsequent course of the case unless modified at or before trial to prevent manifest injustice. (Cal. Rules of Court, rule 216; see also *K. King & G. Shuler Corp.* v. *King* (1968) 259 Cal.App.2d 383, 394 [66 Cal. Rptr. 330]; *Hurd* v. *Paquin* (1964) 229 Cal.App.2d 634, 636 [40 Cal.Rptr.

---

[2]The pretrial conference order itself does not list the issues in dispute between the parties. However, it incorporates the separate pretrial statements of the parties, and plaintiff's statement recites as an issue, "[w]as the shooting of the decedent by officers Kilgo and Reinhart [*sic*] negligent?"

524]; *Aero Bolt & Screw Co.* v. *Iaia* (1960) 180 Cal.App.2d 728, 743 [5 Cal.Rptr. 53].)

■ The trial judge apparently premised his decision to remove the negligence issue from the jury's consideration upon the theory that plaintiff could not go to the jury on both negligence and intentional tort principles. He reasoned that, since both Officer Kilgo and Officer Rinehart admitted they shot Grudt with intention to kill or seriously harm him, there could no longer be any issue of their negligence in the shooting. We conclude the trial court's ruling lacks support in law or reason.

There is an abundance of authority permitting a plaintiff to go to the jury on both intentional and negligent tort theories, even though they are inconsistent. ■ It has often been pointed out that there is no prohibition against pleading inconsistent causes of action stated in as many ways as plaintiff believes his evidence will show, and he is entitled to recover if one well pleaded count is supported by the evidence. (*Wells* v. *Brown* (1950) 97 Cal.App.2d 361, 364 [217 P.2d 995]; see also *Barr* v. *Carroll* (1954) 128 Cal.App.2d 23, 27 [274 P.2d 717].) "[T]here exists an inconsistency between a cause of action for wilful injuries and a cause of action for injuries arising from negligence. But it is not such an inconsistency as would either have prevented the uniting of the two causes of action in the same complaint originally or the reliance upon both by the plaintiff at the trial. . . . The law is well settled in this state that a plaintiff may plead and proceed to trial upon inconsistent causes of action. . . ." (*Figlietti* v. *Frick* (1928) 203 Cal. 246, 249 [263 P. 534]; see also *Horstman* v. *Krumgold* (1942) 55 Cal.App.2d 296, 297-298 [130 P.2d 721]; 2 Witkin, Cal. Procedure (1954) §§ 185-186, pp. 1163-1164.) ■ Thus, in the case at bar, plaintiff was free to present evidence predicated upon both theories to the jury and she was entitled to instructions on both negligence and intentional tort, unless defendants could demonstrate they were entitled to a nonsuit on one or both issues.

■ If we deem defendants' motion to exclude the negligence issue from the jury's consideration as equivalent to a motion for nonsuit,[3] the trial court's decision to grant the motion is equally indefensible. ■ The rule, repeated recently in *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84], provides that "[a] nonsuit in a jury case or a directed verdict may be granted only when disre-

---

[3]The effect of the trial judge's ruling on the motion was identical to that of a nonsuit—to remove the issue of negligence from the jury's consideration after the presentation of plaintiff's case in chief. The only difference was that the motion was made later than motions for nonsuit are proposed in normal sequence and earlier than motions for directed verdict are offered.

garding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor."

■ Viewing the evidence favorably to plaintiff, a jury could have believed that Grudt, burdened with a hearing deficiency and hailed to stop by two men in civilian clothes riding in an unmarked automobile in a high crime area late at night, believed he was about to be robbed. He tried to elude his pursuers and he hid his wallet under the front seat. He came to a stop just south of the on-ramp to the Santa Monica freeway at a red traffic light, and was shot before his vehicle had moved. A jury adopting this view of the facts might have found that Kilgo and Rinehart were negligent in not permitting uniformed police officers in black and white cars to make the arrest. Also, whether Kilgo was negligent in approaching the deceased's vehicle with a loaded shotgun and in rapping the muzzle of this lethal weapon against the window to attract attention were questions of fact for the jury. Finally, even if the jury believed that Grudt accelerated his automobile toward Rinehart, they might have found negligence on the part of the officers in interpreting the circumstances as necessitating a shotgun blast and four rounds from a revolver, designed to kill, although Grudt was hemmed in by black and white police vehicles converging to his front and rear. None of these suggested findings of negligence would have been precluded even if the jury believed the officers' testimony that they shot intentionally, and, in any event, the jury was free to disbelieve that portion of the testimony.

At the very least, the evidence favorable to plaintiff raised a reasonable doubt whether Kilgo and Rinehart acted in a manner consistent with their duty of due care when they originally decided to apprehend Grudt, when they approached his vehicle with drawn weapons, and when they shot him to death. ■ "[T]he actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law." (*Toschi* v. *Christian* (1944) 24 Cal.2d 354, 360 [149 P.2d 848].) ■ Therefore, the trial judge should have instructed the jury on both negligence and intentional tort theories and left it to their judgment to decide which, if either, was factually established.

■ The police tactical manual pertaining to the use of firearms, previously received in evidence, was stricken after the issue of the officers' negligence had been excluded from the jury's consideration on the assump-

tion that the manual was no longer relevant to issues remaining in the case. Having determined that the negligence issue was improperly excluded, we hold a fortiori the manual should not have been stricken as being irrelevant. The manual prescribed rules regarding occasions for the limited use of firearms by police officers. In the circumstances of the Grudt incident, the manual justified the use of deadly force by an officer only if it was necessary to save himself, a citizen, a brother officer, or a prisoner from death or grave bodily harm. ■■■ As we stated in *Dillenbeck* v. *City of Los Angeles* (1968) 69 Cal.2d 472, 478 [72 Cal.Rptr. 321, 446 P.2d 129], "[t]he safety rules of an employer are . . . admissible as evidence that due care requires the course of conduct prescribed in the rule. Such rules implicitly represent an informed judgment as to the feasibility of certain precautions without undue frustration of the goals of the particular enterprise." ■■■ Also, the manual was admissible "on the ground that an employee's failure to follow a safety rule promulgated by his employer, regardless of its substance, serves as evidence of negligence." (*Id.* at p. 481.)[4]

■■■ The prejudicial effect of the trial court's erroneous decision to grant defendants' motions to exclude the issue of the officers' negligence and to strike the police tactical manual from evidence need not be belabored. The plaintiff was deprived of a crucial theory in her case which would have supported a jury verdict in her favor. By definition, that is reversible error.

## III

Plaintiff's third contention raises questions regarding the proper scope of impeachment of witnesses in a context which is of first impression. Edward Plankers and, to a lesser extent James Graves, testified for plaintiff to a version of the shooting incident which conflicted with the testimony of the police officers who were on the scene. Over objection, defense counsel impeached both men with evidence of prior criminal arrests, on the theory that such arrests were relevant to show bias against the police officers on trial.

The impeachment of Mr. Graves occurred during the course of his cross-examination on two different days of the trial. On the first day, the following colloquy occurred:[5]

---

[4]Even had the negligence issue been properly excluded from the case, it is arguable that the manual was relevant to the remaining issue of intentional tort. The rules on the use of firearms related to the issue of the reasonableness of the force used for self-defense by the officers—an issue which remained in the case on the cause of action predicated upon an intentional tort.

[5]We omit quotations from, but merely note, plaintiff counsel's repeated objections to the questions of the defense counsel and the rulings of the court. All of the objections were directed to the impropriety of the impeachment and all were overruled.

"By Mr. Daly: Q. Mr. Graves, have you ever been convicted of a felony?

"A. Convicted? No.

"Q. Did you ever plead guilty to a felony?

"A. No." Counsel for plaintiff, Mr. Belli, objected.

"The Court: It's a proper question. Have you ever been convicted of a felony? You may answer that yes or no.

"The Witness: I've violated a probation, if that is a conviction; but behind the probation I was found not guilty, but I was put on probation, and a fine, which I did violate."

Further inquiry along these lines was postponed until the following morning, when the trial judge made this ruling:

"The Court: All of the testimony of this witness in reference to being convicted of a felony or being on probation is stricken from the record, and the jurors are to disregard it and treat it as though they had never heard of it. . . .

"Mr. Belli: Excuse me. Just a minute. Will your Honor, respectfully, instruct the jury that the witness has not been convicted of a felony?

"The Court: The defendant [*sic,* witness] has not been convicted of a felony.

"Mr. Belli: Thank you.

"The Court: He has been arrested. All other testimony in reference to this witness regarding arrest or felony is stricken from the record, other than the fact that he suffered an arrest."

After plaintiff's counsel objected to the judge's references to arrest and his motion for mistrial was denied, defense counsel proceeded to further cross-examine Graves. On recross-examination, the following colloquy ensued:

"Mr. Daly: Let the record indicate that this is for the purpose not of impeachment but for the purpose of bias, motive and prejudice." Mr. Belli's objection was overruled.

"By Mr. Daly: Q. Mr. Graves, on April 4, 1959, were you arrested for statutory rape by the City of Los Angeles police officers?" Mr. Belli's objection was overruled.

"Q. By Mr. Daly: Were you arrested on April 4, 1959, for statutory rape by the City of Los Angeles Police Department?

"A. Yes, I was.

"Q. And were you arrested on 11-13-59 for traffic warrants by the Los Angeles Police Department?" Mr. Belli's objection was overruled.

"Q. By Mr. Daly: Were you arrested in 1961 for narcotics?

"A. Not that I recall." Mr. Belli's objection was overruled and his motion for mistrial was denied.

"Q. By Mr. Daly: Were you arrested on June 27, 1961, by the Los Angeles Police Department for more traffic warrants?

"A. Perhaps." Mr. Belli's objection was overruled.

"Q. By Mr. Daly: October 14, 1963, were you arrested for more traffic warrants?" Mr. Belli's objection was overruled and his motion for mistrial was denied.

"The Witness: It's possible." Mr. Belli's motion for mistrial was denied.

"Q. By Mr. Daly: July 24, 1964, were you arrested for failing to appear on traffic warrants?" Mr. Belli's objection was overruled.

"Q. By Mr. Daly: June 13, 1965, were you arrested for violation of 459 of the Penal Code, burglary?

"A. No." Mr. Belli's objection was overruled.

"Q. By Mr. Daly: On March 10, 1966, were you arrested for 459 P.C., charged with 484 Penal Code, petty theft?" Mr. Belli's objection was overruled.

"The Witness: Yes."

The impeachment of Mr. Plankers was accomplished by extrinsic evidence. First, Leroy Craig testified without objection that he had been a coworker of Plankers' at a grocery store, that late in 1963 Plankers told him that he and his family were being harassed by the police and that his son had been arrested in an auto theft ring and his wife had been arrested for drunk driving, and that Plankers said, "I'll get even with those goddam cops." Later, over objection, Officer Owen McGough was allowed to testify that Plankers' son, a juvenile, had been arrested in July 1963 for receiving stolen property. Also, Officer Pollack was permitted to testify over objection that Mrs. Plankers was arrested for driving under the influence of alcohol on September 16, 1963.

The vice in the related impeachment of both witnesses becomes apparent after reference to the Evidence Code. ▆▆▆ Section 787 provides that "evidence of specific instances of his conduct relevant only as tending to

prove a trait of his character is inadmissible to attack or support the credibility of a witness." The only exception to this rule is embodied in section 788, which states: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ."

The rulings of the trial judge in the instant action permitted wholesale circumvention of the language and policy of the foregoing sections of the Evidence Code. Neither Plankers nor Graves had ever been convicted of a felony, and section 787 expressly precludes attacking a witness' credibility by showing prior arrests for misdemeanors or felonies, or prior misdemeanor convictions. Nevertheless, because of the circumstance that the defendants in the action were police officers, defense counsel was allowed to seriously discredit Graves with evidence of his prior misdemeanor and felony arrests, and Plankers with evidence of the arrests of his wife and son.

All of this was undertaken under the guise of suggesting bias of the witnesses against the police in general and Officers Kilgo and Rinehart in particular, but the effect was clearly to accomplish that which the Evidence Code precludes. The members of the jury were permitted—indeed encouraged—to disbelieve the testimony of Graves and Plankers because they were men of generally "bad character" who had been "in trouble" with the police. Long before the rule was codified in the Evidence Code, it had always been held that "[i]t is not previous arrest or 'trouble with the police' that may be used as the basis of impeachment of a witness, but only the previous conviction of a felony may be shown." (*People* v. *Duvernay* (1941) 43 Cal.App.2d 823, 827 [111 P.2d 659].)

Defendants justify their counsel's inquiry on the ground that the Evidence Code does not expressly circumscribe the right of a party to indicate the bias of a witness against him. They refer us to section 780 which provides: "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: . . . (f) The existence or nonexistence of a bias, interest, or other motive." As defendants read the section, section 780 creates a direct conflict with sections 787 and 788 in all cases in which peace officers are parties.

The Evidence Code leaves the question of the admissibility of evidence offered for the purpose of showing bias to the sound discretion of the trial judge. (*People* v. *Wilson* (1967) 254 Cal.App.2d 489, 495 [62 Cal.Rptr. 240].) " '[T]he proper scope for the exercise of discretion by the trial court is in limiting cross-examination to a disclosure of such

facts only as may show the existence of hostility, and rejecting any matters which might be pertinent only to a justification of hostility on the part of the witness, for it is the existence of the feeling which is material, and not the right or wrong in the transaction which occasions it.' " (*Eye* v. *Kafer, Inc.* (1962) 202 Cal.App.2d 449, 456 [20 Cal.Rptr. 841], quoting 74 A.L.R. 1154, 1157; *Estate of Martin* (1915) 170 Cal. 657, 671 [151 P. 138].) ▨ " '[T]he inquiry for impeachment is usually confined to the *prominent* motives for untruthful testimony: *interest* in the suit which *necessarily* tends to bias, and *other circumstances* showing bias which are not too remote.' " (*People* v. *Vanderburg* (1960) 184 Cal.App.2d 33, 41 [7 Cal. Rptr. 287], quoting Witkin, Cal. Evidence (1958) p. 688.)

▨ The only evidence admitted to impeach Plankers and Graves which meets either of the above tests is the testimony of Leroy Craig relating to the attitude of Plankers. Testimony that Plankers had complained of harassment and had vowed to "get even" with the police, if believed, had some tendency to indicate that Plankers was biased against the police generally and therefore may have been biased against Officers Kilgo and Rinehart in particular. ▨ But the evidence that Plankers' wife was arrested for drunk driving and his son for receiving stolen property and that Graves was arrested on several misdemeanor and felony charges did not bear a remote relation to any alleged bias of Plankers or Graves against the two individual officers on trial. The thread of inferences from past arrests by the police, to hostility against police in general, to a willingness to distort testimony in a civil action involving individual police officers unknown to the witness is so tenuous as to render invalid the professed purpose of the defense counsel in offering the evidence.

Were we to approve the trial judge's acceptance of this impeachment evidence, we would erect an insurmountable barrier to an aggrieved citizen's ability to gain proper civil redress against errant peace officers. Parties electing to sue any policeman—for damages in tort, for contract reparations, or merely to collect a debt—would be obliged to produce witnesses willing to be subjected to the degradation of a courtroom examination of their prior arrest records and the records of all members of their families to show bias against police generally. And even if such witnesses were found, their credibility in the eyes of the jury would be seriously impaired by evidence of prior criminal arrests, not because of the likelihood of actual bias, but because of the "bad character" suggested by the mere arrests. Furthermore, the principle advocated by defendants could not be limited to cases in which police officers are parties. Presumably, under defendants' theory, whenever any person testifies contrary to the testimony of a police officer *witness,* the arrest record of that person or of members

of his family would be admissible to imply that he so testified because he was biased against policemen generally. To state the proposition is to compel its rejection.

We hold, therefore, that the trial judge erred when he permitted defendants to invoke the arrest records of Graves and of Plankers' family on the theory that such evidence showed bias against Officers Kilgo and Rinehart. We conclude the purported impeachment constituted an impermissible circumvention of the salutary principles embodied in our Evidence Code.

The judgment is reversed.

McComb, J., Peters, J., Tobriner, J., Burke, J., Sullivan, J., and Files, J.,* concurred.

---

*Assigned by the Acting Chairman of the Judicial Council.