[Crim. No. 29085. Second Dist., Div. Five. May 31, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS HERNANDEZ, Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KAUS, P. J.**—Defendant Luis Hernandez was convicted by a jury of possession of heroin for sale. (Health & Saf. Code, § 11351.) The charged crime allegedly took place on September 3, 1975.

## FACTS

The chief prosecution witness was Los Angeles Police Officer Zeuner, a narcotics investigator. Over defense objections, he first testified to his observations on August 27, 1975. On that day, he and another officer were conducting a surveillance of a methadone center located near 4th and Olive Streets. Zeuner, using a powerful telescope, observed defendant park a red pick-up truck about halfway between the methadone center and the street corner. Defendant left the truck, using the driver's door, entered the passenger's side, stepped outside, closed the truck door, and stood by the truck. At that point, four persons, who had come from the methadone center, approached defendant. Zeuner recognized two persons from previous narcotics investigations. He had arrested one of them for being under the influence of narcotics.

Defendant and the four persons engaged in a conversation for two or three minutes. Zeuner noticed that defendant had his hands in front, near his waist area. The four individuals kept looking at the area where defendant had his hands. After the conversation, the individuals walked away and defendant continued to stand by the truck. Then a few other individuals approached defendant from the area of the methadone center and engaged him in conversation for about 30 seconds, at which point defendant shook his head from side to side. The individuals turned around and walked away from defendant.

Over defendant's objection, Officer Zeuner was then permitted to testify as follows:

"Q. [D]id you have any opinion as to what had occurred here?

"A. [Officer Zeuner] Yes.

"Q. What was that?

"A. I formed the opinion that a narcotic transaction had taken place and that the—outset the end when the two individuals approached him that the defendant was then out of narcotics.

"Q. What significance if any did you place on the shaking of his head from side to side?

"A. That he had been asked if he had any more narcotics and he responded no, he hadn't."

Defendant then walked toward the methadone center and entered the building. Officer Zeuner testified that he left the location and did not detain anyone because the "four individuals I hadn't actually seen a transaction occur, although I felt one had occurred, and that the chances of recovering any type of narcotics off these four individuals was very slim." The officer's reason was that the heroin would have been packaged in a balloon which the buyer would keep in his mouth and would swallow if approached by the police.

On September 3, Officer Zeuner set up another surveillance of the area near the methadone center. He observed defendant driving his truck. Defendant pulled the truck directly behind a blue Chevrolet at the corner of 4th and Olive, left the truck from the driver's side, and walked around to the passenger door, which he opened. He leaned inside and reached toward the floorboard of the passenger seat of the truck. Defendant then stepped out of the truck and closed the door. At that point, four individuals from the methadone center approached defendant. They engaged him in a conversation. One of the individuals started to remove United States currency from his pants pocket.

At that point, Zeuner informed two other officers in a police vehicle two blocks away that he believed a narcotics transaction was taking place. Zeuner then saw the two other officers drive a red unmarked police vehicle and squeal to a stop on Olive at a red light at 4th Street. At the sound of the noise defendant and the other four individuals turned around and looked at the police vehicle. Defendant started to walk toward the methadone center. Zeuner observed that defendant, now about eight feet from his truck, had what appeared to be a small square object in his left hand. Defendant, now close to the trunk of the blue Chevrolet, made a throwing motion with his left hand toward the rear wheel area of the Chevrolet. At this time the other individuals were 15 to 20 feet away from defendant; no one else was around.

While one officer detained defendant, Zeuner went to the area where he had seen the throwing motion. He saw a Camel cigarette pack with the top ripped off sitting directly next to the tire in the curb area. Inside

the pack were 12 orange balloons. Zeuner believed, based on his experience, that the balloons contained street-packaged heroin. He looked inside defendant's truck through the window. On the front seat he saw the top of a Camel pack, which he retrieved. It matched the bottom part found in the gutter. Later analysis showed that the balloons contained heroin. At the time, Officer Zeuner formed the opinion that because of the quantity of heroin and the absence of tracks on defendant's arms, the items were possessed for sale. Each balloon contained about two grams, usually referred to as a spoon. Two grams would be an approximate average use once a day for an average addict.

Ernest Melendrez, a patient at the methadone center, testified for the defense. He was just coming out of the center on September 3, at about the time that Officer Zeuner observed defendant. As defendant got out of the truck, Melendrez approached him because "of a petition that he was drawing to go—" At this point, the prosecutor objected on grounds that Melendrez' answer "would be in the sense of the hearsay state of mind" and "not relevant at this time."

Defense counsel told the court that the "petition was to get reimbursed for a car travelling to the center. Where they used to go to another center, they would get cash reimbursements for car travel. At present, all they get from the methadone center are bus tokens." The court then sustained "the objection as to what the petition was about," ruling that it had "no probative value in this case." Melendrez was then permitted to testify that he approached defendant about a petition, but the court instructed Melendrez that he could not testify "what the substance of the petition was."

Another defendant witness, Jose Fernandez, testified that he approached defendant on September 3 because he "wanted in a petition that was circulating." When the witness tried to explain why he was interested in the petition, defense counsel, in order to abide by the court's previous ruling, stopped him and asked a question in such a way that the answer would not reveal the contents of the petition.

Defendant testified in his own defense. He was a patient at the methadone clinic and was in the area on September 3, about the time Zeuner observed him. He did not have an opportunity to talk to the individuals approaching him, but assumed it was about a petition he had been circulating. He did not, however, have it with him on September 3.

Defendant also testified, in substance, that after the officers searched the street—which was full of garbage cans and bottles—for about 15 or 20 minutes, one of them found something and discussed it with the other officers for a few minutes. The discovery was apparently the package of balloons. He did not throw anything away.

In opening argument to the jury, the prosecutor argued, with respect to the petition, as follows:

Defendant "never denied that he parked his truck there; that he got out; that he stood by the open door; that he reached back in; that people came up; that he had a conversation with them; that they walked away; that he then, two more people came up and he shook his head. [¶] Well, that could not be the petition. [¶] Incidentally, suddenly I am out a petition. I had the petition for the four; suddenly, I do not have the petition. [¶] Now, the petition, I submit to you, is just a ruse to explain his conduct. [¶] But the four people come up to him. In fact, I think it even strengthens the fact—it is meant to be self-serving, to be something to explain away—but instead it is more incriminating, because he did not have that petition. [¶] If that petition existed, he could say to you, ladies and gentlemen, this is the petition I had on that date. [¶] Look at this. There are signatures I got on that date. Here are signatures. [¶] He did not have it with him on September 3rd, and he did not have it with him apparently—well, he did not have it September 3rd. He admitted he did not have it there. [¶] There was something very important to him, and he claims all these people were coming up to him to sign this petition. [¶] One guy was so anxious to sign it, he said to his friend wait, Mr. Hernandez is there at the methadone center all the time. [¶] He comes frequently. He was there at least two days a week, maybe three, maybe four, maybe five. [¶] He cannot even remember; he was there so much. [¶] But he is there, and he has this petition. Mr. Fernandez saw him on that date and he—as he walked out, sees his truck and says I have to sign that petition; wait for me, I am going to sign a petition. [¶] And there is no petition. He does not even bring it. That is the first chance he got. [¶] I think when you consider as another piece of the picture—and I am not saying that any one thing is all so overwhelming and important that you have to consider that in regard to everything else—but it is as the relative convincing force of all of the evidence. [¶] Weigh all of the evidence and put it all together, and see the whole, big, if you will, picture. [¶] If that petition existed, if it had been there, he would have had it that day and he would have had it to show you. But instead, he contrived that in his mind to explain away, so he admit—and he did admit. [¶] . . . . [¶] Now,

he [defendant] says yes, I was there and these people crowded around my truck, as the officers said. And I know it looks bad, you know, in effect. . . . [¶] It may look like a high narcotics traffic area. It may look like there is a lot of ready sources there. [¶] But I had a petition and I was there to get signatures. So they all wanted to sign this petition, and they all flocked around me, and that is why I attracted a crowd, not because I was selling."

After the prosecutor's opening argument, the trial judge apparently recognized that he had erred in refusing to allow defense counsel to question his witnesses about the substance of the petition. The court then purported to solve the problem by ruling that "in order to give you [defense counsel] an opportunity to fully represent your case to the jury, I am going to allow you to state to the jury that the contents of the petition was not discussed because of a court ruling." Defense counsel then argued as follows: "Well, first of all I want to make it clear to the jury that the contents of the petition—that is, what the petition was all about—was not permitted to be introduced into this case. That was a Court ruling, the contents of that petition."

The prosecutor then renewed the matter of the petition in closing argument: "He said well anyways—but that is the defendant's story. Everything has a reasonable explanation. [¶] I was there. They came up to me, not because I had been selling, but because I had a petition and they all wanted to sign this petition. But yet, he does not have the petition with him on the date. Nobody gets to sign it. [¶] He did not bring it into Court. True, the content of it is totally irrelevant, whatever the purpose of that petition. And as counsel seemed to allude that maybe the People could have brought it in. [¶] I do not know how. It is something exclusive to his possession and if he has a right, it is certainly that right that if he has something at home, if he has it, he has a right to keep it. And there is no force I know on earth that puts it within the control of the People. [¶] It is exclusively in the control of the defendant. Here it is. Who cares what it says, but here it is. It exists. [¶] And he did not do that, and you have a right to expect that he should, and you have a right to draw the inference that if he did not bring it in, it did not exist. That was an explanation he gave you. [¶] And I think that shows that the defendant is saying the officers saw that, what they said they saw. But they misinterpreted some very important things; my state of mind and whatever and various state of minds of these other people."

Although the court had permitted defense counsel to refer to the "court ruling," concerning the petition the jury was then instructed, at the People's request, in the exact language of CALJIC No. 1.02, which includes the following: "As to any question to which an objection was sustained, you must not speculate as to what the answer might have been or as to the reason for the objection. . . . You must not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken out by the court; . . ."

Facts will be added below.

DISCUSSION

*The Petition*

■ As the prosecutor made absolutely clear in his argument to the jury, the petition—or, more accurately, the lack thereof—went to the heart of the defense. It was undisputed that defendant was at the methadone center on the two dates and that on both occasions individuals approached him. The prosecutor's theory was that on August 27 a narcotics transaction had taken place. Defendant's only plausible explanation for his popularity on September 3 was the petition he had been circulating on August 27, knowledge of which presumably attracted the four persons who approached him on September 3. The suggestion of a petition circulating among methadone patients may have struck the jury as labored. Junkies are not supposed to be concerned citizens urging others to "SAVE OUR REDWOODS" or to "STOP OFFSHORE DRILLING." Information that the subject matter of the petition was a grievance of direct and exclusive concern to the patients at the methadone center would have had an inestimable effect on the credibility of the defense.[1]

■ To make matters worse, the prosecutor was permitted—indeed encouraged—by the court to argue at length that the alleged petition did not exist because it had not been produced. Finally, even if the court's belated recognition of its error could have been mitigated by permitting defense counsel "to state to the jury that the contents of the petition was not discussed because of a court ruling," whatever help that might have

---

[1]The record does not show whether the petition was physically present in court. The ruling that its contents were irrelevant relieved defendant of any obligation to produce it or to offer proof explaining his inability to do so. (Evid. Code, § 1500 et seq.; see, generally, Witkin, Cal. Evidence (2d ed. 1966) Introduction of Evidence at Trial, § 1313, pp. 1213-1214.)

been to defendant was totally negatived by the court's instructing the jury, without qualification, in the language of CALJIC No. 1.02 concerning questions to which an objection was sustained or offers of evidence that were rejected.

*Expert Evidence*

■ We assume that at one stage of the trial—if not as part of their case in chief, then on rebuttal—the People were entitled to prove what defendant had been doing on August 27. After all it was defendant himself who tried to explain the motive for the four "customers" who approached defendant on September 3, in terms of what he had been doing on August 27. The issue is, however, whether the People could prove defendant's conduct on August 27 by expert testimony that one narcotic transaction had taken place and that another one aborted because defendant had run out of merchandise.

We can find no basis for admitting the expert testimony. Preliminarily, we note that none of the cases admitting or rejecting expert police testimony on the issue of probable cause are relevant.[2] The evidence was not offered for the purpose of justifying a detention or an arrest, but on the issue of what defendant had, in fact, been doing on August 27. "The decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of the inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*People* v. *Sloss* (1973) 34 Cal.App.3d 74, 86 [109 Cal.Rptr. 583]; see also *People* v. *Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435]; *People* v. *Arguello* (1966) 244 Cal.App.2d 413, 420 [53 Cal.Rptr. 245].)

The circumstances of this case furnish no basis for admitting Officer Zeuner's opinion. The jury was fully aware that the contacts which the officer described took place outside of a methadone center "where narcotic addicts, heroin addicts go." They had been informed that two of the four people who approached defendant were narcotics users and

---

[2] Even on the issue of probable cause, the officer's observations would apparently have been insufficient to justify an arrest. (*Cunha* v. *Superior Court* (1970) 2 Cal.3d 352, 357-358 [85 Cal.Rptr. 160, 466 P.2d 704]; *Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 667-669 [87 Cal.Rptr. 202, 470 P.2d 11]; *People* v. *Knisely* (1976) 64 Cal.App.3d 110, 114-118 [134 Cal.Rptr. 269].)

could form their own conclusions about the other two. The officer was no more expert than the jurors concerning the significance of the fact that the four persons kept looking at the area where defendant had his hands. Nor did the officer's expertise add any probative value to defendant's shaking of his head from side to side when he was approached by two other persons. In short, *People* v. *Arguello, supra,* 244 Cal.App.2d 413, 420-421, is directly in point. The evidence was inadmissible. Of course, as *Arguello* also holds, the error in admitting expert testimony where none is needed may be entirely harmless where the expert really adds nothing to what must be apparent to the jury's common sense. This, however, is not such a case. The prosecution went to great lengths to establish the officer's expertise. The conduct which he observed and described to the jury was highly equivocal. To permit him to state his opinion was to invite jury speculation that it was based not merely on his observations, but also on otherwise inadmissible information concerning defendant and his alleged customers which he had received in the course of his duties.

■ It will be observed that the court's errors with respect to the contents of the petition and the admission of expert testimony have a synergistic effect. On the real issue in the case—what happened on September 3—the People obviously benefitted from presenting the incidents of August 27. Yet, not only were they permitted to prove the significance of the observed facts of August 27 by inadmissible evidence, they successfully blocked defense efforts to explain them. Thus, even if, taken in isolation, each error might be harmless, in combination the two are clearly prejudicial.

*Prosecutorial Misconduct*

■ Avowedly for the purpose of establishing bias on the part of defendant's witness Melendrez, the prosecutor asked him: "Well, haven't you been arrested a number of times for—" During the argument at the bench which followed defendant's obvious and well-taken objection (*Grudt* v. *City of Los Angeles* (1970) 2 Cal.3d 575, 590-593 [86 Cal.Rptr. 465, 468 P.2d 825]; *People* v. *Vanderburg* (1960) 184 Cal.App.2d 33, 41-42 [7 Cal.Rptr. 287]) the court advised the prosecutor: ". . . you may just have blown it. You may have a mistrial." While the prosecutor was arguing the propriety of his question, the court had to admonish him not to waive "this"—apparently Melendrez' rap sheet—"around in front of the jury, . . ." Although defendant's objection was sustained, his motion for a mistrial was denied.

The misconduct is obvious. We need not say whether it was error to deny the defense motion for a mistrial. We merely mention it—and ignore other assignments of misconduct because they will surely not reoccur—because it is indicative of the atmosphere in which this case was tried—an atmosphere which during a conference, after the People's opening argument, provoked the court to say to the prosecutor that an unreported remark by him, made in chambers, "was contemptuous . . . beyond the bounds that always surround a lawyer" and add that neither counsel had "acted like lawyers during this trial, more like spoiled children."

The judgment is reversed.

Stephens, J., and Hastings, J., concurred.