Filed 3/23/26  P. v. Aguillon CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064423 |
| v. | (Super. Ct. No. 19NF1490) |
| GABRIEL AGUILLON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge. Affirmed as modified.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, and Arlyn Escalante, Deputy Attorney General, for Plaintiff and Respondent.

\*　　　\*　　　\*

Defendant Gabriel Aguillon was convicted of multiple counts involving the sexual abuse of his then eight-year-old niece. On appeal, he challenges the admission of one line of an expert witness's testimony, and portions of the prosecutor's closing argument, which he claims constitutes misconduct. We find no error.

Aguillon also argues, and the Attorney General agrees, the abstract of judgment must be amended to make clear the trial court found an inability to pay fees and fines, and to provide the correct number of prejudgment credit days. We will instruct the trial court to make the necessary changes to the abstract of judgment. As so modified, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND[1]

C.N. (the victim) is Aguillon's niece. At the time of the incidents at issue here, she was between six and eight years old. The victim testified she loved and trusted Aguillon and was close to him; they lived in the same home (owned by the victim's grandmother, Aguillon's mother), and spent time together playing video games, watching movies, and going to the park.

After the victim's family moved out of her grandmother's home, the victim continued to see Aguillon regularly. The victim's mother would drop her off at her grandmother's home during the day while her mother was at work.

---

[1] Given the limited nature of the issues raised by Aguillon on appeal, our presentation of the facts of the case is also limited.

2

The victim testified Aguillon did all of the following to her: touched her "inappropriately" on her upper thighs; touched her vagina underneath her clothes; grabbed her face and kissed her on the lips; touched her breasts over her clothes; showed her pornographic videos on his laptop computer and told her that "was going to be me and him"; pulled her onto his lap while sitting on his bed and watching pornographic videos, during which she could feel his penis; pulled his penis out of his pants and showed it to her, and then pushed her head toward it; and touched her vagina with his mouth and tongue.

The victim underwent an examination by a sexual assault response team (SART) about two days after the last act of abuse by Aguillon. The SART examiner testified she would not expect to find injury on a child after two days because the anogenital area heals quickly. As part of the examination, DNA swabs were collected.

The victim was interviewed by the Child Abuse Services Team (CAST) a few days after the last act of abuse. The victim told the CAST interviewer that Aguillon showed her a "disgusting" video, showed her his "private part," touched and licked her "private part," and placed his finger inside her "bottom." She could feel his "private part" on her "bottom." He also put his "private part" in her mouth and touched her breasts.

The victim's mother placed a covert call to Aguillon around this time, which was taped by the police. Although Aguillon initially denied everything, he ultimately admitted the victim had seen pornographic videos on his laptop, and that he had touched the victim's vagina over her clothes. He claimed the victim had been looking up pornography on his laptop, and had taken advantage of him by placing his hand inside her pants, placing his penis in her mouth, and essentially forcing him to orally copulate her.

3

Aguillon was interviewed by the police shortly thereafter. He claimed the victim saw a web browser on his laptop which was open to a pornographic website and started asking him about oral sex. Aguillon claimed his eight-year-old niece "took advantage" of him by pulling his pants down while he was asleep and orally copulating him, so he began orally copulating her.

No significant DNA findings were made, meaning there was no clear evidence of Aguillon's DNA on the victim. A forensic scientist from the Orange County Crime Lab testified the lack of DNA on a victim does not mean that a sexual assault did not happen. She testified that the passage of time, bathing, or transferring DNA to another person can all affect whether or not DNA will be detected.

An amended information charged Aguillon with two counts of oral copulation with a child 10 years old or younger (Pen. Code, § 288.7, subd. (b); counts 1, 2), digital penetration of a child 10 years old or younger (*ibid.*; count 3), and two counts of committing a lewd act on a child under 14 years old (§ 288, subd. (a); counts 4, 5). The information alleged as factors in aggravation that Aguillon took advantage of a position of trust, and the victim was particularly vulnerable. (Cal. Rules of Court, rule 4.421(a)(3), (11).) A jury found Aguillon guilty on all counts. In a bifurcated proceeding, the trial court found true the aggravating factors.

The trial court sentenced Aguillon to 30 years to life: 15 years to life on counts 1, 2, and 3, and six years on counts 4 and 5. The sentence on count 3 was to run consecutively to the sentence on count 1, and counts 2, 4, and 5 were to run concurrently. The court found Aguillon had no ability to pay the criminal conviction and court operations fees. It imposed a restitution fine and parole revocation restitution fine of $300 each, and suspended the

4

latter. (Pen. Code, §§1202.4, subd. (b), 1202.45.) The court credited Aguillon with 1,829 actual custody days and 274 good conduct credit days, for a total of 2,103 credit days.

Aguillon filed a timely notice of appeal.

DISCUSSION

I.

EXPERT TESTIMONY

Aguillon argues the trial court prejudicially erred by permitting an expert witness to testify to an ultimate issue in the case. Whether opinion testimony should be admitted is an issue left to the sound discretion of the trial court. (*People v . Clark* (2019) 43 Cal.App.5th 270, 293.)

The prosecutor asked her expert witness on DNA: "So just because DNA is not detected on a victim of a sexual assault, for example, does that mean the sexual assault, did not happen?" Defense counsel objected on the grounds the opinion lacked foundation. The court overruled the objection, and the witness responded, "No." We disagree with Aguillon's initial assumption that the expert testified regarding an ultimate issue in the case. The expert did not testify that a sexual assault occurred in this case; rather, she testified that the lack of DNA on the victim did not mean a sexual assault had not occurred. It remained for the jury to determine whether the alleged assaults did or did not occur.

Here, the witness testified about how surfaces are tested for DNA evidence and the factors that may affect whether DNA may be found, including washing, bathing, using the bathroom, and whether the surface has been touched multiple times. The expert also testified that some individuals are "shedders," who deposit large amounts of DNA, while others are "non-shedders," who deposit little or no DNA. The expert's challenged testimony

5

provided the jury with the information that, under certain circumstances, no DNA may be left behind or DNA that was left behind may have been transferred or washed away.

*People v. Hernandez* (1977) 70 Cal.App.3d 271, on which Aguillon relies, does not require a different conclusion. In that case, a police officer gave his opinion that a drug transaction had occurred based on his observations of the defendant's actions. (*Id.* at pp. 280–281.) Such testimony infringed on the jury's fact-finding role, and was thus impermissible. As explained *ante*, the proffered testimony by the expert witness in the present case did not address the ultimate issue in the case and was not improper.

Even if the trial court erred by permitting this testimony from the DNA expert, the error would not have been prejudicial. This issue is determined under the *People v. Watson* (1956) 46 Cal.2d 818 standard of prejudice. "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 247.) The evidence against Aguillon in this case was overwhelming. The victim provided testimony explaining what Aguillon did to her, which was supported by the CAST interview she gave just days after the assaults. Although Aguillon argues the victim's testimony was inconsistent, the trial was held almost five years after the acts occurred, and the victim testified she had tried to forget about the things he did to her. Further, Aguillon confessed to the victim's mother and to the police that he committed multiple sexual acts against the victim.

Moreover, the jury was properly instructed that it alone was to decide the case, based on the evidence presented to it (CALCRIM No. 200),

and that it was not required to accept as true an expert's opinion (CALCRIM No. 332). We presume the jury understood and followed the trial court's instructions. (*People v. Alvarez* (2025) 18 Cal.5th 387, 458.)

We conclude the trial court did not err by admitting the expert's testimony.

## II.

### PROSECUTORIAL MISCONDUCT

Aguillon argues his convictions must be reversed because the prosecutor committed misconduct four times during closing argument. A prosecutor's comments may require reversal under federal law if they ""'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'"" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) The comments may also violate state law if they involve """"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."""" (*Id.* at p. 1000.) We view the challenged statements within "the context of the argument as a whole." (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.)

Aguillon's defense counsel failed to object to all of the comments he now challenges, and he did not request a jury admonition as to any of them. We could conclude the arguments have been forfeited. (*People v. Choyce* (2025) 18 Cal.5th 86, 113–114.) We will nevertheless address the issue on the merits to avoid the inevitable claim of ineffective assistance of counsel.

A.    *The Challenged Comments*

1.    The prosecutor did not misstate the law regarding reasonable doubt

Aguillon contends the following statement made during closing argument was improper: "Some doubt, some of the stories that you may hear

7

the Defense get up here and tell you to try to poke holes and distract you, that some doubt is not reasonable doubt."

The entirety of this portion of the argument reads as follows:

"In following the law, I only have to prove the elements of each of the crimes. We'll go through each of those elements together. I don't have to answer every single question that you might have, because you will have unanswered questions. This trial would have gone on for weeks if we wanted to answer every single question that we had. But my burden is to just prove each element of the crime beyond a reasonable doubt. And beyond a reasonable doubt is defined in these jury instructions.

"When you go back to the jury room to deliberate, the Judge is going to give you a packet of instructions. He'll read them to you as well. And that's the rules, the laws, that you have to follow in this case. And one of those instructions defines beyond a reasonable doubt. And it defines it as proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some doubt, possible or imaginary doubt.

"So what does leaving you with an abiding conviction mean? It means you look back on this case one week from now, one month from now, years down the road, you say, 'Yeah, he did it. He's guilty.'

"I am not required to prove this case to a hundred percent certainty. Some doubt, some of the stories that you may hear the Defense get up here and tell you to try to poke holes and distract you, that some doubt is not reasonable doubt. So I'm telling you there's only one reasonable explanation in this case and that's the defendant is guilty of all these counts."

The prosecutor did not dilute her burden of proof with her comments regarding "some doubt." The comments explained that she did not

have to prove the case *beyond any doubt*. The jury was instructed by the trial court that it must follow the law in the jury instructions and any contrary argument by the attorneys must be rejected. The jury was properly instructed regarding reasonable doubt.

2. The prosecutor did not unduly disparage Aguillon

Aguillon contends the following italicized comments by the prosecutor during closing argument unduly disparaged him:

"Little eight-year old [victim] doesn't know what ejaculate is, doesn't know what ejaculation is. That's exactly what happened. *This disgusting pervert* not only put his—

"[Defense counsel]: Objection. Improper.

"The Court: Overruled.

"[The prosecutor]: *This disgusting pervert* put his penis into her mouth, this little eight-year-old girl's mouth, and ejaculated because he's so turned on. That's who we're dealing with.

"[The victim] even drew for [the CAST interviewer] what the penis looked like. How it was sticking out of the jogger shorts. Interesting, she has the penis sticking straight up out of the jogger shorts. She knows exactly what it looked like because this happened to her. None of this is made up. There's no unreliability of her statements like the Defense was trying to get at with [the CAST interviewer], when they were going back and forth. No. She told us exactly what happened. She told [the CAST interviewer] exactly what happened to her.

"And guess what, we don't just have [the victim]'s statements. You have the covert call. You have the defendant himself saying these things.

"Mom is asking, 'Did you ever put your penis in her mouth?'

"'No, that was all her, actually,' little eight-year-old kid.

9

"'Yeah, I think my memory is starting to come back.'

"Weird; right?

"'I was sleeping and, yeah, she was, like, trying to put things in her mouth.'

"He's admitting that he had her—his penis in her mouth. He's trying to minimize it. He thinks justifying it by saying, 'She did it to me' is maybe somehow that makes him look better. No. *That's how demented his mind is*." (Italics added.)

A prosecutor may not suggest to the jury that it should decide the case based on emotion or ask the jury to act in an irrational or subjective manner. (*People v. Leon* (2015) 61 Cal.4th 569, 605–606.) But the use of a derogatory epithet to describe the defendant is not necessarily misconduct. (*People v. Tully* (2012) 54 Cal.4th 952, 1021.) Courts have found there was no misconduct where the prosecutor referred to the defendant as an animal, a monster, a perverted murderous cancer, a sociopath, a reprehensible excuse for a human being, or garbage. (See *People v. Krebs* (2019) 8 Cal.5th 265, 341; *People v. Thomas* (1992) 2 Cal.4th 489, 537; *People v. Montes* (2014) 58 Cal.4th 809, 890; *People v. Tully,* at p. 1021.)

We conclude in the context of this case, the use of the terms "disgusting pervert" and "demented" to describe Aguillon were within the limits of what is permitted during argument, were supported by the evidence, and did not encourage the jury to decide the case based on the prosecutor's opinion or on the jury's emotions rather than on the evidence.

3. The prosecutor did not improperly appeal to the jurors' sympathy for the victim

Aguillon next challenges the following argument by the prosecutor as appealing to the jury to empathize with the victim and let their

10

decision be guided by emotion: "You want to say he didn't do any of this stuff? Yeah, right. Porn websites are a window into the fantasies, sexual fantasies, of a human being. This is his sexual fantasy. And he played it out in reality with his poor eight-year-old niece."

The prosecutor did not unduly appeal to the jurors' emotions. At most, this argument emphasized the victim's vulnerability. However, the jury sat through the victim's testimony and the video of her CAST interview. Any reference to the victim as a "poor eight-year-old" was not enough to sway the jury to focus on its emotions. The cases cited by Aguillon are not on point. (See *People v. Vance* (2010) 188 Cal.App.4th 1182, 1192–1193 [improper to ask jury to put themselves in the shoes of the victim during guilt phase of trial]; *People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 920 [improper to ask jury to view the crime through the victims' eyes].)

      4.     The prosecutor did not misstate the law on the presumption of innocence

Finally, Aguillon challenges the following argument from the prosecutor, which he claims prejudicially misstated the law regarding the presumption of innocence:

"All right. Ladies and gentlemen, I sat through all of this testimony just like you did and I heard testimony and the closings and I heard time after time [defense counsel] say you have to give the benefit of the doubt to the defendant. No, not anymore. You listened to that evidence. You saw all the testimony. The benefit of the doubt does not go to the defendant. He is no longer presumed innocent. All of the evidence shows that he is 100 percent guilty. I have gone beyond my standard of proof. [¶] It is now time to protect the child. It is now time to protect [the victim].

"[Defense counsel]: Objection. Improper.

11

"The Court: Sustained."

The law allows a prosecutor, at the conclusion of the presentation of evidence, to argue to the jury that the presumption of innocence has been overcome. In *People v. Jimenez* (2019) 35 Cal.App.5th 373, 383, the prosecutor argued: "'Now, at this point you heard all the evidence. You still have to hear the argument from [defense counsel] and final argument from me, but you've heard all the evidence. You've seen all three girls. You have had a chance to observe them, to listen to what they had to say. You've heard from the defendant. You heard those calls. You know now we're at the point where, you know, he's no longer presumed innocent, the line has been moved, and he's now been proven guilty. And I ask you to return verdicts finding him guilty of all counts, and to find that he did commit these offenses against multiple victims.'" The appellate court concluded that there is no misconduct when the prosecutor contends the presumption of innocence has been overcome by the evidence. (*Id.* at p. 385.) This is also what happened here, and we, too, conclude there is no misconduct.[2]

B.    *Was Any Error Prejudicial?*

Even if one of the foregoing comments by the prosecutor could be considered to be misconduct that should have been addressed by the trial court, we would conclude the error was not prejudicial. As explained *ante*, the evidence against Aguillon (including his own admissions to the crimes) was overwhelming. The jury was correctly instructed regarding the burden of proof and the presumption of innocence, that the arguments of the attorneys

---

[2]    Like our colleagues in the Sixth District, we hasten to add that "we do not encourage the use of the statement made by the prosecutor here because of the risk of juror confusion," although the statement does not constitute misconduct. (*People v. Jimenez, supra*, 35 Cal.App.5th at p. 385.)

are not evidence, and that the jury "must not let bias, sympathy, prejudice, or public opinion influence [its] decision." Under either the federal or state standard, Aguillon cannot establish prejudice.

## III.

### ABSTRACT OF JUDGMENT AND CALCULATION OF CREDITS

Aguillon argues, and the Attorney General agrees, the abstract of judgment must be amended to correctly reflect the trial court's oral pronouncement of judgment.

At sentencing, the trial court found Aguillon did not have the ability to pay the court fees. The abstract of judgment, however, imposes a court security fee of $200 and a criminal conviction assessment of $150. We will direct the trial court to amend the abstract of judgment accordingly. (*People v. Costella* (2017) 11 Cal.App.5th 1, 10.)

Aguillon also argues, and the Attorney General again agrees, that Aguillon's custody credits were not accurately calculated. Based on counsel's representations, the trial court awarded Aguillon 1,829 actual credit days and 274 good conduct credit days, for a total of 2,108 custody credits. Aguillon actually had 1,859 actual credit days, and good conduct credit days should have been calculated to be 278. Therefore, the court's minute order should be corrected to reflect 2,137 total credit days, and the abstract of judgment should be amended accordingly.

## DISPOSITION

The clerk of the superior court is directed to issue an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The amended abstract is to be corrected to reflect: (1) Aguillon does not have the ability to pay the court security fee and criminal conviction assessment, and (2) defendant is entitled to 1,859 custody

13

credit days and 278 good conduct credit days, for a total of 2,137 credit days. In all other respects, the judgment is affirmed.


BANCROFT, J.*

WE CONCUR:


GOODING, ACTING P. J.


SCOTT, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.