Filed 5/10/17 Unmodified opinion attached

**CERTIFIED FOR PARTIAL PUBLICATION**

| | |
|---|---|
| APPLIED MEDICAL CORPORATION,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>T. PETER THOMAS et al.,<br><br>    Defendants and Respondents. | A145867<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]**<br><br>(San Mateo County<br>Super. Ct. No. CIV519758) |

THE COURT:

It is ordered that the opinion filed April 12, 2017 be modified as follows:

(1) On page 14, footnote 9, replace the sentence "We note that the plain language of the stock option agreements calls into question the existence of any right to challenge the valuation." with the following:

"We note that the plain language of the stock option agreements provided only a limited basis to challenge Applied's valuation: the agreements specified the Compensation Committee's good faith determination 'shall be conclusive and binding.'"

(2) On page 20, the following sentence is deleted: "Moreover, it is not clear whether Thomas possessed the stock certificates; that is not a subject addressed in the parties' statements of undisputed facts."

There is no change in the judgment.

Respondents' petition for rehearing is denied.


Dated: _____                    _____, P.J.


1

Superior Court of San Mateo County, No. CIV519758, Hon. Elizabeth Lee, Judge.

Jones Day, Nathaniel P. Garrett, Richard J. Grabowski, and Meredith L. Williams, for Plaintiff and Appellant.

Keker & Van Ness, Susan J. Harriman, Matthew Werdegar, Kate E. Lazarus, Sophie Hood, for Defendants and Respondents.

Filed 4/12/17 Unmodified opinion

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| APPLIED MEDICAL CORPORATION,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>T. PETER THOMAS et al.,<br><br>        Defendants and Respondents. | A145867<br><br>(San Mateo County<br>Super. Ct. No. CIV519758) |

After defendant and respondent T. Peter Thomas (Thomas"), a member of the Board of Directors of plaintiff and appellant Applied Medical Corporation ("Applied"), was removed from the Board, Applied exercised its right to repurchase shares of its stock issued to Thomas as part of certain stock incentive plans. Thomas objected to the repurchase price, and in August 2012 Applied filed the instant lawsuit. In June, 2015, the trial court granted summary judgment against Applied, which timely appealed. We affirm as to Applied's fraud-based claims, but reverse as to Applied's claims based on breach of contract and conversion. In the published portion of this opinion we address two issues. First, the trial court erred in determining Applied's conversion claim failed. We conclude such a claim may be based on either ownership *or* the right to possession at the time of conversion. Second, we conclude the trial court correctly ruled Applied's fraud claims were barred by the applicable statute of limitations. We reject Applied's argument that those claims, first alleged in 2014, were timely under either the discovery rule or the relation back doctrine.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

1

Applied is a provider of specialty medical products for surgical and minimally invasive procedures. Defendants and respondents Reid W. Dennis ("Dennis") and Thomas are general partners of Institutional Venture Management IV, L. P. ("IVM"). IVM is the general partner of defendant and respondent Institutional Venture Partners IV, L.P. ("IVP"), a venture-capital investment limited partnership. From 1988 to 1992, IVP made substantial financial investments in Applied. In 1988, Thomas joined Applied's Board of Directors ("Board").

In 1998 the Board approved Applied's 1998 Stock Incentive Plan (the "1998 Plan") regarding stock option awards. In 2003, the Board approved a stock option program proposed by Thomas for individuals serving as outside directors on the Board. Between 2003 and 2008, Thomas received five stock option grants pursuant to the 1998 Plan, and between 2009 and 2010, he received two stock option grants pursuant to Applied's Amended and Restated 2008 Stock Incentive Plan (the "2008 Plan").

The 1998 Plan included a provision giving Applied the unilateral right to repurchase shares upon termination of a director's service. The agreements corresponding to Thomas's grants under the 1998 Plan stated Applied would "have the right (but not the obligation) to repurchase . . . any or all of the Shares acquired pursuant to the exercise" of the stock option upon termination of the optionee's service. Thomas acknowledged he, upon exercise of the repurchase right, "shall be obligated to sell his . . . Shares to the Company." Thomas also represented the options were "being acquired . . . for [his] personal account, for investment purposes only, and not with a view to the distribution, resale or other disposition thereof."

The 2008 Plan also gave Applied the right to repurchase shares from Thomas, and, in accepting stock option grants under the 2008 Plan, Thomas again acknowledged his

---

[1] "On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 (*Miller*).) Our factual summary reflects that standard of review.

obligation to sell his shares to Applied upon exercise of the company's repurchase right. Thomas also represented any shares would be acquired with his "own funds for investment for an indefinite period for your account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof," and that he had no "contract, understanding or agreement with any person to sell, transfer, or grant participation" to his options.

The IVM partners had an oral agreement regarding stock options obtained due to a partner's service on the board of directors of a company in which IVP had invested, like Applied. Under that agreement, the IVM partners provide the funds to purchase stock and, when the stock is sold, the proceeds are shared among the partners.[2]

According to Applied, Thomas did not disclose the stock-sharing agreement. Applied CEO Said Hilal ("Hilal") learned of the possibility that Thomas would share stock proceeds for the first time shortly before a Board meeting on or around February 24, 2011.[3] Thomas said he "might share" the proceeds of the stock options awarded to

---

[2] Respondents Dennis and Thomas described the agreement as a "proceeds-sharing arrangement" in their declarations in support of the summary judgment motion. Because the declarations do not suggest participation is optional, we use the term agreement for the purposes of this decision. The parties apparently dispute whether the agreement involved the sharing of stock ownership or only of the proceeds of stock sales. We need not resolve that question and will refer in this decision to the "stock-sharing agreement" for the sake of convenience. Thomas also had a written agreement with his general partners at IVM that arguably required sharing of the proceeds of stock sales.
[3] Respondents contend Thomas disclosed the stock-sharing agreement in an October 2003 e-mail to Hilal, in which he said "I think it's fair to give me an option, but it turns out that those shares will actually become IVP [IV] shares eventually and so the amount that I get from it will be about 15% based on my ownership of the IVP IV fund. That is just a policy we have and although I'd like to have them all because I believe in the company, the policy isn't something that I can change." That e-mail was not included in respondents' separate statement of undisputed facts; instead, it was presented to the trial court for the first time when respondents filed their reply brief in support of their motion for summary judgment. Although the trial court denied appellant's motion to strike any references to the 2003 e-mail, the court did not refer to the 2003 e-mail in granting respondents' motion for summary judgment. We need not address the propriety of considering that e-mail in support of the motion for summary judgment because, like the

3

him with his partners at IVP. Hilal was "surprised" by Thomas's suggestion because he considered it "completely contrary to the reason that the Company adopted a stock option program for directors in the first place – to compensate directors for their individual service." Thomas told Hilal he had "misunderstood;" Thomas said he was only "thinking about sharing his stock options" and he had not actually decided to do so. Thomas averred in his declaration that he "voluntarily disclosed the proceeds-sharing arrangement" to Hilal at the February 2011 Board meeting.

Applied raised concerns about the stock-sharing agreement in a December 1, 2011 e-mail from Applied's general counsel to Thomas. He wrote, "Said [Hilal] mentioned a discussion during the Applied Board meeting in February [2011], regarding the Applied stock options granted to you over the years. Our understanding is that you have an arrangement with IVP by which your Applied stock options are shared with your partners. You will recall that Said was surprised to learn of the arrangement, which was not known to Applied or the board. We believe the arrangement is inconsistent with the purpose of Applied's outside Director option program – to provide a form of compensation and incentive to the directors – for their service as directors. During that discussion with Said, you agreed to the cancellation of the options." Thomas replied that same day, stating "The stock options that I've earned over the years are not inconsistent with what your purpose [is.] It is to reward me. I own the shares and the shares are never going to be in any name but my name. Whether I share some of the proceeds of the sale in the future is my business and my sharing of the information with Said that I would probably share the benefits is for information only. I have no intention of ever putting any of those shares in the name of anybody but me. [¶] I also NEVER told Said that it was okay to cancel any of my shares and definitely am not willing to have those shares cancelled."

---

trial court, we conclude Applied's fraud claims are untimely without reference to the 2003 e-mail.

4

In January 2012, Thomas was voted off the Applied Board, apparently due to an alleged conflict of interest relating to IVP's efforts to compel Applied into an initial public offering in mid-2011.

On February 1, 2012, Thomas exercised his stock options and purchased 37,950 shares of Applied stock. On February 16, Applied confirmed the purchase and issued a stock certificate in Thomas's name. At the same time, Applied notified Thomas it was exercising its rights under the stock-option agreements to repurchase the shares. Applied stated the "Fair Market Value" of the shares was $13.05 each, and the company made available a check in the amount of $495,247.50. The 1998 and 2008 Plans set the repurchase price as the "Fair Market Value" of the shares, as determined "in good faith" by the Applied Board's Compensation Committee. Both plans state the determination "shall be conclusive and binding." The $13.05 purchase price for Thomas's shares was based on a valuation from a third-party firm that had performed valuations of Applied's stock since 2004.

On March 6, 2012, an attorney for IVP responded on behalf of Thomas to Applied's repurchase notification. The letter stated that Thomas "disputes Applied's fair market value determination of $13.05," explaining the amount was far less than a binding third party offer for the stock and a third party valuation obtained by IVP. The letter requested that Applied "either rescind [the] offer to repurchase Mr. Thomas' option shares and deliver the shares to him, or, in light of the third party offer received by Mr. Thomas and the independent valuations outlined above, make an offer at a price reflecting an actual good faith fair market value."

Outside counsel for Applied responded by letter on April 20, 2012, stating, among other things, that the stock option agreements "contemplate that fair market value is determined through Applied's usual valuation process." The letter enclosed a check for $495,247.50 and warned that if Thomas did not return his "duly executed stock powers by April 27," Applied would consider him "to be in breach of his obligations under the stock option agreements." Applied's general counsel wrote to Thomas's counsel on June

5

warning that Thomas "remains in breach of his obligations" under the stock option agreements.

Applied filed the present lawsuit against Thomas and IVP on August 31, 2012. Applied asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, aiding and abetting conversion, and declaratory relief. Broadly speaking, the claims were based on Thomas's alleged refusal to transfer his shares to Applied after the company exercised its repurchase rights.

On or about September 6, 2012, Thomas cashed Applied's check for $495,247.50 and deposited the proceeds into his personal checking account. On September 10, an attorney for Thomas sent Applied an executed stock-assignment form for Thomas's 37,950 shares, signed by Thomas on September 5, while reserving the right to continue to dispute the valuation.

On June 24, 2014, Applied moved for leave to file a Second Amended Complaint ("SAC"). The SAC was filed on August 15. The claims in the SAC, the operative complaint in the present case, are as follows: breach of contract (first cause of action; against Thomas); breach of the implied covenant of good faith and fair dealing (second cause of action; against Thomas);[4] conversion (third cause of action; against Thomas and IVP); aiding and abetting conversion (fourth cause of action; against IVP); fraudulent concealment (fifth cause of action; against Thomas and IVP); aiding and abetting fraudulent concealment (sixth cause of action; against Dennis); breach of fiduciary duty (seventh cause of action; against Thomas); and declaratory relief (eighth cause of action; against Thomas). Broadly speaking, the fraud-based claims are based on Thomas's failure to disclose the stock-sharing agreement.

In December 2014, respondents filed a motion for summary judgment or, in the alternative, summary adjudication. In April 2015, Applied moved for leave to file a

---

[4] According to the SAC, the trial court previously sustained a demurrer to the second cause of action for breach of the implied covenant of good faith and fair dealing and the SAC stated the claim was "realleged . . . solely to preserve the claim for purposes of appeal." No contentions regarding that cause of action have been asserted in the present appeal.

6

Third Amended Complaint ("TAC") adding, among other things, new theories of liability based on the language of an IVM partnership agreement obtained in discovery. The trial court continued the hearing on the motion for leave to file the TAC until after the hearing on the motion for summary judgment.

On June 5, 2015, the trial court granted respondents' motion for summary judgment. The motion for leave to file the TAC was denied "in light of" the ruling on the summary judgment motion. This appeal followed.

DISCUSSION

The trial court granted summary judgment to respondents on all of Applied's causes of action. We conclude the court erred as to the breach of contract, conversion, and aiding and abetting conversion causes of action, but the court properly granted summary judgment as to Applied's fraud-based causes of action (fraudulent concealment, aiding and abetting fraudulent concealment, and breach of fiduciary duty) on statute of limitations grounds.[5]

"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *id.*, § 437c, subd. (f) [summary adjudication of issues].) The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish, a prima facie case. . . .' [Citation.] On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller, supra*, 36 Cal.4th at p. 460.) "We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.)

I.     *Applied's Breach of Contract Claim*

---

[5] Applied does not challenge the trial court's grant of summary judgment on the eighth cause of action for declaratory relief on the ground of mootness.

7

Applied's first cause of action for breach of contract is based on Thomas's alleged delay in returning an executed stock-assignment form transferring his shares of stock back to Applied.[6] The claim is based on provisions in his stock option agreements giving Applied the right to repurchase his shares and obligating Thomas to "sell his . . . Shares to the Company" upon such repurchase. The trial court concluded respondents were entitled to summary adjudication of the claim because Thomas did not breach his stock option agreements and Applied suffered no cognizable harm due to any breach. The court erred.

A.    *There is a Disputed Issue of Fact Whether Thomas Breached an Implied Reasonableness Requirement in the Contract*

In concluding Applied's breach of contract claim fails as a matter of law, the trial court reasoned that Thomas's stock option agreements "did not impose any deadline on Thomas'[s] return of paperwork transferring ownership of the shares" to Applied. However, as Applied points out, section 1657 of the Civil Code provides that if a contract does not specify the time by which an act is "required to be performed, a reasonable time is allowed." (See also *Kotler v. PacifiCare of California* (2005) 126 Cal.App.4th 950, 956 ["The obligations of a contract . . . must be performed either at a time the contract specifies or within a reasonable time."]; *Palmquist v. Palmquist* (1963) 212 Cal.App.2d 322, 331 [where a contract is "silent as to the time of delivery a reasonable time for performance must be implied"].) The section also provides, "[i]f the act is in its nature capable of being done instantly--as, for example, if it consists in the payment of money only--it must be performed immediately upon the thing to be done being exactly ascertained." (Civ. Code § 1657.)

Respondents argue the trial court correctly concluded the stock option agreements set no deadline for returning stock transfer paperwork. They point to deposition

---

[6] Applied refers to return of the "stock certificates," while respondents refer to return of the "stock-assignment form." In this decision we refer to return of the form, but that should not be understood to reflect a determination on the merits of any dispute underlying the choice of wording because that is not an issue addressed by the parties in their briefs.

8

testimony of Applied's Chief Accounting Officer, who was designated by Applied as the person most qualified to testify regarding Applied's "understanding of the terms and conditions of" and "management or administration of the 1998 Stock Plan, the 2008 Stock Plan, and the Thomas stock option agreements." She acknowledged, "the company's repurchase right imposes certain time constraints on the company, but it does not impose any time constraints on the optionee." However, that testimony does not unequivocally disclaim the *implied* requirement of reasonableness in Civil Code section 1657; the testimony may mean only that the agreements do not *expressly* specify a time for performance.[7] Moreover, respondents cite no authority such testimony takes precedence over "the general principle of contract law articulated in Civil Code section 1657." (*Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, 30 (*Wagner*).)

Respondents also argue Applied forfeited any argument based on the "reasonable time" provision in Civil Code section 1657, because Applied argued to the trial court that the section required Thomas to deliver the form "immediately" after receiving notice of Applied's exercise of its repurchase right. It is true that Applied cited Civil Code section 1657 and argued below, "[b]ecause Thomas could have instantly returned title of his shares to Applied Medical by signing the stock power sent along with the repurchase price, his obligation to perform was immediate." But Applied's argument continued, "Whether a promisor's performance is sufficiently 'immediate'—let alone 'reasonable'— is a 'question of fact to be determined by the trier of fact.' [Citation.] In the seven-month period between February 16, 2012, when Applied Medical exercised its undisputed repurchase right, and September 10, 2012, when Thomas finally returned the

---

[7] The trial court asserted Applied was required to "prove that Thomas actually breached some express provision of his stock option agreements," citing *San Mateo Union High School Dist. v. County of San Mateo* (2013) 213 Cal.App.4th 418, at page 439 (*San Mateo*). But *San Mateo*, which itself involved an alleged " 'contract implied in fact' " does not support that proposition. (*Id.* at p. 439.) We do not understand respondents on appeal to dispute that an implied provision, such as that provided for in Civil Code section 1657, may form the basis for a breach of contract claim.

9

stock power requested by the Company subject to a wholesale reservation of rights, Thomas failed to respond to two separate demand letters from the Company insisting that he return the shares. [Citation.] Thomas knew that Applied Medical had a contractual right to repurchase his shares. [Citation.] Yet Defendants have no explanation for why they waited seven months to return the stock powers. [Citation.] Defendants do not even attempt to argue that that delay was sufficiently immediate or even reasonable, thereby waiving the argument. [Citation.] Accordingly, summary judgment is likewise foreclosed on this ground." Applied also argued Thomas's delay was "not reasonable" at the hearing on the summary judgment motion. Thus, Applied *did* argue below that Thomas failed to comply in a reasonable time.

On the merits, respondents do not contend the seven-month period between Applied's repurchase and Thomas's return of an executed stock assignment form was reasonable. But they do contend the period for return commenced "when Thomas accepted Applied's repurchase payment" as opposed to "when Applied notified Thomas that it was exercising its repurchase right." That distinction does not aid respondents' cause. If Thomas had a reasonable time to comply with his obligations after Applied exercised its right to repurchase the stock, that timeline also applied to Thomas's acceptance of Applied's payment. If seven months was an unreasonable time to wait before returning the stock assignment form, it likely was also an unreasonable time for Thomas to wait before accepting Applied's payment. In any event, the contract language is not susceptible to respondents' interpretation. The agreements state, "Upon exercise of the Repurchase Right, the Optionee shall be obligated to sell his or her Shares to the Company . . . ." or "Upon exercise of the Repurchase Right, you shall be obligated to sell your Shares to the Company . . . ." Thus, Thomas's obligations were triggered by Applied's exercise of its rights, not when Thomas decided to accept Applied's payment.

We conclude whether Thomas complied with his contractual obligations is a disputed question of fact. (*Wagner*, *supra*, 41 Cal.4th at p. 30 [" '[W]hat constitutes a reasonable time is a question of fact, depending upon the situation of the parties, the nature of the transaction, and the facts of the particular case.' [Citation.]"]; accord *The*

10

*McCaffrey Group, Inc. v. Superior Court* (2014) 224 Cal.App.4th 1330, 1351.)  The trial court erred in concluding Applied could not show Thomas breached the stock option agreements.

B.       *Applied Has Shown Cognizable Damages from the Breach*

The trial court also concluded Applied's breach of contract claim fails because of "the lack of any legally cognizable harm as a result of Thomas' alleged misconduct." The court erred.

To show breach of contract, Applied must show Thomas's "breach of [his] obligation proximately caused harm."  (*San Mateo*, *supra*, 213 Cal.App.4th at p. 440.) Applied alleges it was harmed by Thomas's failure to timely comply with his obligation to transfer his shares to Applied because the company "was forced to expend time and money seeking the return of its shares."  Specifically, Applied argues it incurred "(i) fees from its valuation firm for work confirming the propriety of its valuation; (ii) fees from its auditing firm, which was hired to investigate the legitimacy of Thomas' valuation challenges; and (iii) fees from its attorneys at Skadden Arps, who (among other things) wrote demand letters to Thomas in an effort to persuade him to comply with his legal obligations."

1.       *Applied's Claim Encompasses the Valuation Challenge*

At the outset, respondents contend all of those damages actually result from Thomas's attorney's March 2012 letter challenging the valuation, rather than from Thomas's failure to timely comply with his obligation to return the stock assignment form to Applied.  Respondents argue Applied cannot base its damages claim on the challenge to the valuation because the only contractual breach alleged by the company is Thomas's delay in returning the form.  We disagree.[8]

---

[8] Because we conclude Applied can base its damages claim on Thomas's valuation-challenge-based refusal to transfer the shares, we need not address whether Applied's claims should have survived summary judgment based solely on the damages due to Applied's retention of attorneys to demand Thomas's compliance with his contractual obligations or based on the possibility of an award of nominal damages.  On November 29, 2016, respondents moved to augment the record to include certain additional

11

The SAC prominently and repeatedly alleges that Thomas improperly challenged the company's valuation. The summary of action and factual allegations, incorporated into the breach of contract cause of action, contain various detailed allegations about Thomas's challenges to the valuation and the contractual impropriety and factual inaccuracy of the challenges. The summary emphasizes the role of the valuation challenge in Thomas's breach of the stock option agreements, stating "Mr. Thomas has failed to comply with the clear terms of the Thomas Stock Option Agreements and, in failing to comply with those terms, has acted in concert with, and at the direction of, the Fund and Mr. Dennis. Mr. Thomas, the Fund and Mr. Dennis share a common motivation to inappropriately inflate the price at which Applied Medical repurchases Mr. Thomas' shares, because Mr. Thomas has entered into a side agreement . . . under which any stock compensation awarded to Mr. Thomas as a director of Applied Medical will be shared with the Fund and/or one or more of its general partners. In addition, Defendants' actions are part of a larger conspiracy by Mr. Thomas and the Fund to inflate the price of Applied Medical stock to be sold by the Fund to public investors . . . ."

The cause of action for breach of contract in the SAC summarizes the background regarding Applied's repurchase of Thomas's stock, including that the company's market value "determination is binding upon Mr. Thomas as a plan participant." The SAC then states, "As set forth above, Mr. Thomas has breached his contractual and common law obligations to Applied Medical under each of the applicable stock option agreements by his refusal to deliver to the Company duly endorsed stock certificates, stock powers, or any other instrument appropriate to complete the transfer of title to the shares to Applied Medical or completing the repurchase of the 37,950 shares following the Company's exercise of its Repurchase Right. Only after Applied Medical incurred the substantial burden and expense of preparing and filing this lawsuit did Mr. Thomas finally cash Applied Medical's check and deliver the duly endorsed stock powers for the 37,950 shares that he had improperly withheld. Despite cashing the check and delivering the

materials they argued were relevant to the nominal damages issue. We have denied that motion in a separate order.

12

stock powers, Mr. Thomas has continued to dispute the fair market valuation reached by Applied Medical, as evidenced by the September 10, 2012 letter from the Fund's counsel, which states that Mr. Thomas 'dispute[s] the fair market value determination of $13.05 per share used in connection with the repurchase, and reserves the right to continue to do so.' "

" 'The first step in analyzing a motion for summary judgment is to identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading.' " (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 957; see also *Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98–99, fn. 4 ["A defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers."].) In the present case, a fair reading of the SAC is that Thomas's challenge to the valuation was his *means* of delaying delivery of the stock assignment form. (Cf. *Government Employees Ins. Co, supra,* at pp. 98–99, fn. 4 [defendant moving for summary judgment not required to address claim asserted by plaintiff where the "clear, sole thrust of the pleading" was an unrelated claim and "[n]othing in the complaint suggests or gives notice that [the plaintiff] was dissatisfied" in the respect at issue].) As Applied argues on appeal, the SAC alleges the company was harmed by Thomas's "refusal to deliver his shares—a refusal predicated on Thomas'[s] demand that Applied make an alternative 'offer' at a higher price." That is a "theory reasonably contemplated by" the SAC that respondents were required to address in order to obtain summary judgment. (*McCaskey*, at p. 957.)

We conclude that damages resulting from Thomas's refusal to transfer his shares to Applied on the basis of a valuation challenge are within the scope of the SAC.[9]

_____

[9] Respondents contended for the first time at oral argument that Applied would have incurred the valuation-related expenses even if Thomas had promptly returned the executed stock assignment form. There is no basis in the record to affirm on that ground.

13

2.      *Application of the Litigation Privilege is A Disputed Factual Issue*

The trial court concluded Applied's damages for breach of contract could not be based on Thomas's attorney's March 2012 letter challenging the valuation because that letter was protected by the litigation privilege of Civil Code § 47.  The court relied on the proposition that the privilege "has been broadly applied to demand letters and other prelitigation communications by attorneys."  (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 919 (*Blanchard*).)  The court erred.

"The [litigation] privilege applies to 'any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) to have some connection or logical relation to the action.' "  (*Blanchard*, *supra*, 123 Cal.App.4th at p. 919.)  " '[A] prelitigation statement is protected by the litigation privilege of [Civil Code] section 47, subdivision (b) when the statement is made in connection with a proposed litigation that is "contemplated in good faith and under serious consideration." ' . . . .  [I]f the statement is made with a good faith belief in a legally viable claim and in serious contemplation of litigation, then the statement is sufficiently connected to litigation and will be protected by the litigation privilege.  [Citation.]  If it applies, the privilege is absolute."  (*Blanchard*, at p. 919; see also *Action Apartment Assn. Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*) ["A prelitigation communication is

---

Respondents appear to argue Thomas would have retained the right to challenge the valuation even if he returned the form, and that challenge would have required Applied to incur the same costs.  We note that the plain language of the stock option agreements calls into question the existence of any right to challenge the valuation.  Moreover, respondents cite no evidence that Thomas would have ignored that language and pursued a challenge to the valuation if he lacked the leverage provided by withholding the stock assignment form.  Although Thomas reserved the right to dispute the valuation when he finally did return the form, there is no indication he pursued the dispute.  Indeed, respondents asserted below that return of the form "concluded Thomas' contractual relationship with Applied" and that there was no justiciable controversy regarding the validity of Applied's valuation.  Further, there is no evidentiary basis in the record for concluding as a matter of law that the costs incurred by Applied in response to Thomas's challenge to the valuation would have been the same if Thomas had returned the executed stock assignment form.  We cannot affirm on this ground.

14

privileged only when it relates to litigation that is contemplated in good faith and under serious consideration."].)

"Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact." (*Action Apartment*, *supra*, 41 Cal.4th at p. 1251.) In the present case, that is plainly a disputed issue. The March 6, 2012 letter challenging the valuation was Thomas's first response to Applied's February 16 letter exercising its repurchase rights. Applied's letter did not suggest Thomas was in breach of contract, and the March letter requested only a higher offer or rescinding of the repurchase—it did not assert Applied's offer was a breach of contract and did not raise the possibility of litigation. The first references to breach of the stock option agreements *followed* the March letter, in April and June 2012 letters from Applied asserting that Thomas's refusal to transfer his shares was a breach, although even those letters did not threaten litigation. Accordingly, the exchange of communications does not on its face demonstrate that the March 2012 letter was in contemplation of litigation.

In support of application of the litigation privilege, Thomas averred in a declaration in support of the motion for summary judgment that the March 2012 letter was sent "in anticipation of potential litigation concerning Applied's repurchase of my Applied stock." However, saying the communication was made in "anticipation of potential litigation" is not the same as saying litigation was "under serious consideration." Any letter written by a competent attorney relating to a client's contractual rights and obligations is written in "anticipation of potential litigation" in the sense that the attorney considers what effect the letter would have if litigation were to occur. But the litigation privilege has not been extended to cover *any* communication by an attorney relating to a client's rights under an ongoing contract. (See *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 33 ["In the present litigious society, there is always at least the *potential* for a lawsuit any time a dispute arises between individuals or entities. More than a mere possibility or vague 'anticipation' of litigation must be required for the privilege to attach."].) Moreover, Applied presented deposition

testimony from respondent Dennis, IVM's general partner, from which a jury could infer litigation was *not* under "serious consideration."[10]

The trial court erred in concluding as a matter of law that Applied could show no harm on the breach of contract claim due to the litigation privilege of Civil Code section 47.

II.     *Applied's Conversion Claims*

Applied's claims for conversion (third cause of action) and aiding and abetting conversion (fourth cause of action) are based on Thomas's alleged conversion of 37,950 shares of stock that Thomas failed to transfer to Applied upon the company's exercise of its repurchase right. The trial court granted summary judgment on Applied's conversion claims, concluding Applied suffered no cognizable harm and Applied "cannot prove that it owned or actually possessed the property at issue at the time of the alleged conversion." The court erred.

As to the first ground, the trial court erred in concluding Applied could not show damages for the reasons stated previously with respect to Applied's contract claim. (See also *Virtanen v. O'Connell* (2006) 140 Cal.App.4th 688, 708 [" 'the normal measure of damages for conversion' " includes " 'fair compensation for the time and money properly expended in pursuit of the property' (Civ. Code, § 3336)"].)

As to the second ground, " ' " 'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages.' " ' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240.) "Neither legal title nor absolute ownership of the

---

[10] We do not detail the testimony, which appears to be covered by the trial court's sealing order. Because we conclude there is a disputed issue of fact as to whether the March 2012 letter was in serious contemplation of litigation, we need not address Applied's argument that the litigation privilege is inapplicable because its "damages were not caused by the attorney's statements per se, but by Thomas' decision to repudiate his stock option agreements and his failure to tender title to the shares to Applied Medical based on a purported valuation dispute."

property is necessary.  [Citation.]  A party need only allege it is '*entitled to immediate possession at the time of conversion.*' "  (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 452 (*Farmers*); accord *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38, 45; see also *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395 (*PCO, Inc.*) ["The tort of conversion is derived from the common law action of trover.  The gravamen of the tort is the defendant's hostile act of dominion or control over a specific chattel to which the plaintiff has the right of immediate possession."].)

The trial court concluded Applied's conversion claim failed because Thomas had possession and title to the shares at the time of Applied's exercise of its repurchase rights and, therefore, Applied could not show it owned or actually possessed the shares.  For the proposition that Applied had to show ownership or possession, the court relied on language in *Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, that a "plaintiff must have 'either ownership *and* the right of possession or actual possession [of the property] at the time of the alleged conversion thereof.' "  (*Id.*, at p. 233 (italics added), quoting *General Motors A. Corp. v. Dallas* (1926) 198 Cal. 365, 370.)  To the extent *Rutherford Holdings* suggests right to possession alone is an insufficient basis to support a conversion claim, the case is directly contrary to the authorities cited above, including the Supreme Court's 2015 decision in *Lee v. Hanley*, *supra*, 61 Cal.4th at page 1240.  (See also Wiseman & Reese, Cal. Practice Guide: Civil Procedure Before Trial, Claims and Defenses (The Rutter Group 2016) ¶ 12:100; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 699.)  We follow the Supreme Court's recent pronouncement in *Lee v. Hanley*, as well as the weight of other authority, that a plaintiff can base a cause of action for conversion on either ownership *or* right of possession.

Respondents assert that "contractual rights to purchase or obtain the property at issue are not sufficient" to support a cause of action for conversion.  However, the cases they cite only stand for the proposition that "a mere contractual *right of payment*, without more, will not suffice."  (*Farmers*, *supra*, 53 Cal.App.4th at p. 452 (italics added); accord *Rutherford*, *supra*, 223 Cal.App.4th at p. 233; see also *PCO, Inc.*, *supra*, 150 Cal.App.4th

17

at p. 395 [" 'Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment.' "].)  Applied's claim for conversion of stock is not a contractual right of payment and does not fall within that rule.

The claim in the present case is similar to that in *Cerra v. Blackstone* (1985) 172 Cal.App.3d 604.  There, the defendant took possession of an automobile that secured an auto loan and, according to the plaintiff's evidence in opposition to a motion for summary judgment, refused to return the vehicle after the plaintiff tendered the amount owed.  (*Id.* at pp. 606–607.)  The court concluded, "[o]nce it is determined that [plaintiff] has a right to reinstate the contract, he has a right to possession of the vehicle and standing to bring conversion.  Unjustified refusal to turn over possession on demand constitutes conversion even where possession by the withholder was originally obtained lawfully."  (*Id.* at p. 609.)  The present case, in which Thomas allegedly refused to transfer the stock following Applied's repurchase, is analogous.  (See also *Wade v. Markwell & Co.* (1953) 118 Cal.App.2d 410, 418 ["Having thus alleged a demand accompanied by sufficient tender, defendant's refusal to restore her coat, and certain other facts tending to show defendant's fraudulent dominion over the coat inconsistent with her right to immediate possession, the complaint contains all the requisites of a cause of action for conversion."].)  The trial court erred in concluding Applied's right to possess the shares after exercise of its repurchase rights was an insufficient basis for the conversion claim.

In its opinion granting the motion for summary judgment, the trial court also briefly addressed whether Applied would have a valid conversion claim if, as Applied claimed, the company automatically regained ownership of the shares after exercise of its repurchase rights.  The court concluded Applied's claim would fail in that instance because "Thomas would no longer have any ability to exert dominion over the shares, a required element of conversion."  The court did not cite authority for that proposition.  On appeal, respondents echo the court's statement and also assert, again without citation to authority, that "[i]f Applied already owned the shares, returning the

18

assignment form did not transfer title to the shares and therefore was a meaningless act involving a useless piece of paper." We decline to affirm on that ground, because we cannot conclude as a matter of law that Thomas's conduct was insufficient to support the conversion claim.

"[A]ny act of ownership or exercise of dominion over the property of another, in defiance of his rights, is a conversion of that property." (*Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 143.) As explained in *Mears v. Crocker First Nat. Bank* (1948) 84 Cal.App.2d 637, 644 (*Mears*), it is "well settled in California that shares of corporate stock are subject to an action in conversion" and "it is not necessary that possession of the certificate evidencing title be disturbed." Instead, it is sufficient that there is interference with the owner's "free and unhampered right to dispose of property without limitations imposed by strangers to the title." (*Ibid.*)

In the present case, regardless of whether Applied needed the executed stock assignment form to engage in any transactions related to the shares, there is at least a disputed issue of fact whether Thomas's conduct actually interfered with Applied's control over the shares by creating a dispute on the issue of ownership. (See *Mears*, *supra*, 84 Cal.App.2d at p. 644 ["One of the incidents of ownership is the free and unhampered right to dispose of property without limitations imposed by strangers to the title."].) Thomas's failure to execute the stock assignment form, accompanied by his refusal to cash Applied's check, could reasonably be viewed as an assertion by Thomas that he continued to own the shares. There is evidence that this was Applied's understanding and that the company did not believe it could treat the stock as belonging to it: Applied's Chief Accounting Officer averred the Accounting Department was required to reverse accounting entries reflecting company ownership of the shares until Thomas transmitted executed stock powers and cashed the company's check. Moreover, it is not clear whether Thomas possessed the stock certificates; that is not a subject addressed in the parties' statements of undisputed facts.

On the record before this court, a reasonable jury could find Thomas's actions frustrated Applied's "free and unhampered right" to control the shares following exercise

19

of its repurchase rights.  (See *Ralston v. Bank of California* (1896) 112 Cal. 208, 212-213 [conversion claim where defendant corporation refused to register a transfer of shares]; *Mears*, *supra*, 84 Cal.App.2d at p. 639 [conversion claim where defendant transfer agent refused to convert shares into blocks of shares for sale on stock exchange]; *Jackins v. Bacon* (1923) 63 Cal.App. 463, 466-468 [conversion claim where defendant refused to surrender shares for cancellation even though plaintiff was in possession of the original certificates].)  Indeed, respondents strenuously argued below and on appeal that Applied did *not* regain ownership of the shares upon the company's exercise of its repurchase rights, and respondents cite no authority the interference at issue in the present case is insufficient to support a conversion claim.  The trial court's order cannot be affirmed on the ground that Thomas's conduct does not support a conversion claim as a matter of law.

III.     *Applied's Fraud Claims*

On June 24, 2014, a little less than two years after the filing of the original complaint, Applied sought leave to file the SAC to add causes of action for fraudulent concealment (the fifth cause of action; against Thomas and IVP), aiding and abetting fraudulent concealment (the sixth cause of action; against Dennis), and breach of fiduciary duty (the seventh cause of action; against Thomas).  The SAC was filed on August 15.[11]  Those fraud-based claims arise from Thomas's alleged failure to disclose his stock-sharing agreement with his partners.  Applied alleged that, had it known, it would not have awarded stock options to Thomas, or it would have cancelled them.  Applied contends the trial court erred in concluding its fraud claims are time-barred under the three-year statute of limitations in Code of Civil Procedure section 338.  We reject Applied's contentions.

A.     *The Discovery Rule*

---

[11] Respondents contend the relevant date for statute of limitations purposes is in August 2014, when the SAC was filed with approval of the court, rather than when Applied sought leave to file the SAC in June.  However, as respondents acknowledge, it makes no difference which date is considered for statute of limitations purposes.

Applied contends its fraud claims are timely under the discovery rule. "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806–807 (*Fox*).) " 'The policy reason behind the discovery rule is to ameliorate a harsh rule that would allow the limitations period for filing suit to expire before a plaintiff has or should have learned of the latent injury and its cause.' " (*Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 797–798.)

"[W]hen a plaintiff relies on the discovery rule or allegations of fraudulent concealment, as excuses for an apparently belated filing of a complaint, 'the burden of pleading and proving belated discovery of a cause of action falls on the plaintiff.' " (*Czajkowski v. Haskell & White, LLP* (2012) 208 Cal.App.4th 166, 174 (*Czajkowski*); see also *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 833 [" 'It is plaintiff's burden to establish "facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." ' "].) "[T]he plaintiff claiming delayed discovery of the facts constituting the cause of action has the burden of setting forth pleaded facts to show ' "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." ' " (*Czajkowski*, at p. 175; see also *Fox*, *supra*, 35 Cal.4th at p. 808.)

B.     *Application of the Discovery Rule*

The trial court concluded Applied "learned of the proceeds-sharing arrangement in February 2011" and, therefore, was required to assert its claims by February 2014. The court was referring to a conversation Thomas and Applied's CEO Hilal had around the time of a February 2011 Board meeting. According to Hilal's declaration submitted in opposition to summary judgment, on or around February 24, 2011, "Thomas indicated . . . that he 'might share' the proceeds of the stock options awarded to him by Applied . . . with his partners at IVP." Hilal averred that the suggestion "surprised" him "because it

21

was completely contrary to the reason that the Company adopted a stock option program for directors in the first place – to compensate directors for their individual service." Hilal reacted negatively, and Thomas said Hilal "misunderstood." According to Hilal, "Thomas said that he was only thinking about sharing his stock options, and that he had not actually decided to share the proceeds of his options with IVP." Hilal averred in his declaration that he "understood from Mr. Thomas'[s] use of the word 'probably' that he had the choice of either sharing or not sharing the proceeds of his stock options with his partners in the event that he exercised his options and purchased the resulting shares. Moreover, his suggestion that he 'might share' the options with IVP conveyed to me that he had not made a decision to do so, and that he still had a choice in the matter." Hilal averred that Thomas did not disclose the existence of any stock-sharing agreement.

On appeal, Applied argues "Thomas' partial and misleading disclosure in February 2011 did not alert Applied Medical to its injury: i.e., that Thomas had fraudulently induced the Company into awarding stock options to Thomas in his individual capacity when, at the time of those awards, Thomas actually" had a secret agreement to share the stock with his partners. Applied argues Thomas's reassuring response relieved Applied of any obligation to bring suit. It cites *Unruh-Haxton v. Regents of the University of California* (2008) 162 Cal.App.4th 343, where patients who received fertility treatments learned in the news that their doctors had stolen genetic material from patients. (*Id.* at p. 349.) A trial court sustained a demurrer to a resulting suit, holding the action was untimely as a matter of law because the patients should have suspected injury earlier. (*Ibid.*) The court of appeal reversed, noting that plaintiffs had received "incomplete medical records and reassuring telephone calls" and the reasonableness of the plaintiffs' reliance on those assurances could not be decided as a matter of law. (*Id.* at p. 367.)

Were Hilal's account of the February 2011 conversation with Thomas the only relevant evidence in the record, we would agree the trial court erred in granting summary judgment. The conversation as described by Hilal did not constitute disclosure of the stock-sharing agreement. Instead, Thomas allegedly disclosed only that he *might* share

22

the proceeds and he did not indicate any sharing would be pursuant to an agreement. Thomas's alleged statements did not as a matter of law notify Applied of its injury or trigger Applied's duty to investigate. Based on Hilal's account alone, application of the discovery rule would be a disputed issue of fact. (See *Broberg v. Guardian Life Ins. Co. of America* (2009) 171 Cal.App.4th 912, 921 ["When a plaintiff reasonably should have discovered facts for purposes of the accrual of a case of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence . . . can support only one reasonable conclusion."].)

However, Hilal's account is *not* the only evidence in the record. The trial court made reference to a December 2011 e-mail in which Applied's general counsel wrote to Thomas, "[Hilal] mentioned a discussion during the Applied Board meeting in February [2001], regarding the Applied stock options granted to you over the years. Our understanding is that you have an arrangement with IVP by which your Applied stock options are shared with your partners." Applied asked Thomas to relinquish his stock options because "the arrangement is inconsistent with the purpose of Applied's outside director option program." That e-mail demonstrates that, despite the ambiguous nature of Thomas's comments as described by Hilal, Applied actually had knowledge of the stock-sharing agreement when the e-mail was sent. Because Applied does not allege any other communications from Thomas about the stock-sharing agreement, the December 2011 e-mail reveals that Hilal actually understood Thomas's comments as a disclosure of a stock-sharing agreement, that Applied actually suspected and uncovered Thomas's alleged wrongdoing after the February communication, or that Applied learned about the stock-sharing agreement through some other means, either before or after the February 2011 meeting.

Although the record does not reflect precisely *when* Applied learned of the stock-sharing agreement, it was Applied's burden in claiming delayed discovery to set forth facts showing " ' "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." ' " (*Czajkowski*, *supra*, 208 Cal.App.4th at p. 175; see also *Fox*, *supra*, 35 Cal.4th at p. 808.) As explained by the

California Supreme Court, "if an action is brought more than three years after commission of the fraud, plaintiff has the burden of pleading and proving that he did not make the discovery until within three years prior to the filing of his complaint. [Citations.]  Further, . . . plaintiff must affirmatively excuse his failure to discover the fraud within three years after it took place, by establishing facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry." (*Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 437; accord *Sun'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 701–702; *Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1472; *Investors Equity Life Holding Co. v. Schmidt* (2011) 195 Cal.App.4th 1519, 1533; see also *Samuels v. Mix* (1999) 22 Cal.4th 1, 14 [distinguishing wording of statute of limitations in attorney malpractice actions from that applicable to fraud actions].)  Absent an explanation from Applied as to when prior to December 2011 it acquired knowledge of the stock-sharing agreement, and why it could not have acquired such knowledge earlier, the trial court properly concluded Applied could not rely on the delayed discovery rule to defeat respondents' motion for summary judgment.

That Thomas was in a fiduciary relationship with Applied by virtue of membership on the Board does not change the result.  (See *WA Southwest 2, LLC v. First American Title Ins. Co.* (2015) 240 Cal.App.4th 148, 157 (*WA Southwest 2*) [" ' "when a potential plaintiff is in a fiduciary relationship with another individual, that plaintiff's burden of discovery is reduced and he is entitled to rely on the statements and advice provided by the fiduciary" ' "].)  Even if Applied was, as it asserts, "entitled to take Thomas at his word when he said that he was merely 'thinking' of sharing his Applied stock with his partners," the December 2011 e-mail from Applied's general counsel shows that the company was not actually misled or that it had knowledge of the stock-sharing agreement through other means.[12]  It is Applied's failure to present evidence of

---

[12] In response to the December 2011 e-mail, Thomas said, "I own the shares and the shares are never going to be in any name but my name," and "[w]hether I share some of the proceeds of the sale in the future is my business and my sharing of the information

24

the time and manner of discovery, and its inability to have made earlier discovery, that is fatal to its reliance on the discovery rule to overcome the statute of limitations.[13]

C. *The Relation-Back Doctrine*

We also reject Applied's contention that its fraud-based claims are timely because they relate back to the claims in Applied's original complaint, filed in August 2012. "The relation-back doctrine requires that the amended complaint must (1) rest on the *same general set of facts*, (2) involve the *same injury*, and (3) refer to the *same instrumentality*, as the original one." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 408–409.) Applied's original claims rest on Thomas's refusal to return a stock-assignment form after the company exercised its repurchase right in February 2012. The fraud-based claims rest on Thomas's alleged failure to disclose the stock-sharing agreement on multiple occasions beginning in December 2003, when Applied began issuing stock options to Thomas.

The fraud claims in the SAC involve different facts establishing liability, different injuries, and different instrumentalities from the claims in the original complaint. The claims in the original complaint allege defendants deprived Applied of its stock

with Said [Hilal] that I would probably share the benefits is for information only." Applied argues Thomas failed in that response to comply with his fiduciary obligation to fully disclose and describe the stock-sharing agreement. However, the December 2011 e-mail reflected Applied's actual knowledge, or at least serious suspicion, of the existence of such an agreement; the limitations period commenced when that knowledge was acquired. (*WA Southwest 2, supra*, 240 Cal.App.4th at p. 157 ["even assuming for the sake of argument that each of the respondents had a fiduciary duty to plaintiffs, this does not mean that plaintiffs had no duty of inquiry if they were put on notice of a breach of such duty"].) Thomas's response to the December 2011 e-mail did not deny there was an arrangement to share stock proceeds and did not toll the running of the statute of limitations that had previously commenced.

[13] Because we affirm the trial court's decision based on the evidence of the February 2011 conversation and the December e-mail, and Applied's failure to show it did not or could not have learned of the agreement within the limitations period, we need not consider the propriety of considering the 2003 e-mail from Thomas to Applied disclosing "a policy" under which his "shares will actually become IVP shares eventually and so the amount that I get from it will be about 15% based on my ownership of the IVP IV fund." (See *ante* p. 3, fn. 3.)

repurchase rights starting in February 2012. The fraud claims in the SAC allege that, beginning at least by December 2003, Thomas concealed the stock-sharing agreement from Applied, causing Applied to issue stock options it would not otherwise have awarded to Thomas. Although both sets of claims relate to the stock options issued to Thomas, the claims rest on different sets of facts (2012 delay in stock repurchase vs. concealment of stock-sharing agreement starting in 2003), different injuries (loss of repurchase rights vs. undue issuance of stock options), and different instrumentalities (delay in returning stock assignment form vs. concealment of material facts regarding ownership of stock options). (Cf. *Norgart*, *supra*, 21 Cal.4th at p. 409 [relation back doctrine would apply where, although later claim involves a different defendant, all claims relate to same allegedly wrongful death].)

The dissent suggests the original complaint alleged Thomas's secret stock-sharing agreement was a breach of the stock option agreements. That is not how we read the complaint. In the "Summary of the Action" the complaint alleges "Thomas and the Fund share a common motivation to inappropriately inflate" the stock repurchase price because "Thomas has entered into a side agreement . . . under which any stock compensation awarded to Mr. Thomas as a director of Applied Medical will be shared with the Fund and/or one or more of its general partners." Then the complaint includes a background allegation that defendants were motivated to inflate the valuation because "Thomas is obligated through a secret agreement with the Fund and/or one or more of its general partners to share any stock awards he received during his service as a director." Thus, the stock-sharing agreement is described as a motivation for Thomas's delay in returning the stock-assignment form. There are no allegations that concealment of the agreement resulted in the undue issuance of options. And, more fundamentally, the causes of action in the original complaint are based entirely on Thomas's delay and the identified injury is Applied's loss of repurchase rights. Phrasing it slightly differently, the background allegations regarding concealment provide no factual basis for any element of the causes of action in the original complaint. We are aware of no authority requiring this court, in applying the relation back doctrine, to treat the original claims as encompassing stray,

26

undeveloped background allegations in the complaint that refer to different injuries at different times. That is a step we are not prepared to take.

Applied contends the fraud claims relate back because, like the contract and conversion claims, they involve "Thomas's malfeasance with respect to his stock option agreements." Similarly, the dissent refers to "Thomas's misappropriation of stock options in violation of the stock option agreements and Applied's property interests." But we are aware of no authority supporting the proposition the relation-back doctrine applies wherever a plaintiff can define the defendant's misconduct in sufficiently general terms to encompass all of the claims at issue. (See *Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, 698 [amended medical malpractice complaint that alleges different negligent act does not relate back].) Neither appellant nor the dissent has been able to identify any cases applying the relation back doctrine in circumstances similar to those in the present case, where the sets of claims involve different injuries occurring years apart. We conclude Applied has not shown the relation-back doctrine applies.

As explained above, the trial court properly concluded respondents were entitled to summary adjudication of Applied's fraud-based claims.[14]

DISPOSITION

The judgment is reversed. The trial court's order on respondents' motion for summary judgment is reversed to the extent it granted summary adjudication of Applied's claims for breach of contract, conversion, and aiding and abetting conversion; summary

---

[14] In light of this conclusion, it is unnecessary to consider respondents' additional contentions challenging the bases for liability against respondents IVP and Dennis. Neither need we consider Applied's contention the trial court erred by denying Applied leave to file the TAC, because Applied does not argue its amendments would have affected this court's analysis on the fraud claims.

27

adjudication of the remaining claims is affirmed.  The case is remanded for further proceedings consistent with this opinion.  Each party shall bear its own costs on appeal.

 

 

_____

SIMONS, J.

 

I concur.

 

_____

BRUINIERS, J.

**JONES, P. J., Concurring and Dissenting.**

I concur in my colleagues' judgment reversing summary adjudication of Applied's claims for breach of contract, conversion, and aiding and abetting conversion, but must dissent from their conclusion regarding the application of the relation back doctrine to Applied's fraud-based claims alleged in the Second Amended Complaint (SAC), i.e. fraudulent concealment (fifth cause of action; against Thomas, and Institutional Venture Partners IV, L.P. (IVP)); aiding and abetting fraudulent concealment (sixth cause of action; against Dennis); and breach of fiduciary duty (seventh cause of action; against Thomas). I would conclude the fraud-based claims relate back to the original complaint and are not time barred.

"An amended complaint is considered a new action for purposes of the statute of limitations only if the claims do not 'relate back' to an earlier, timely-filed complaint. Under the relation-back doctrine, an amendment relates back to the original complaint if the amendment: (1) rests on the same general set of facts; (2) involves the same injury; and (3) refers to the same instrumentality. [Citations.] An amended complaint relates back to an earlier complaint if it is based on the same general set of facts, even if the plaintiff alleges a different legal theory or new cause of action. [Citations.]" (*Pointe San Diego Residential Community, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP* (2011) 195 Cal.App.4th 265, 276–277 (*Pointe*).)

"In determining whether the amended complaint alleges facts that are sufficiently similar to those alleged in the original complaint, the critical inquiry is whether the defendant had adequate notice of the claim based on the original pleading. 'The policy behind statutes of limitations is to put defendants on notice of the need to defend against a claim in time to prepare a fair defense on the merits. This policy is satisfied when recovery under an amended complaint is sought on the same basic set of facts as the original pleading. [Citation.]' [Citations.]" (*Pointe, supra*, 195 Cal. App.4th at p. 277, fn. omitted.)

In my view, the SAC "rests on the same general set of facts" as the original complaint. (*Pointe, supra*, 195 Cal.App.4th at p. 277.) The original complaint alleged

1

Thomas violated the stock option agreements, in part by failing to timely return an executed stock-assignment form transferring his shares of stock back to Applied. The complaint also alleged Thomas violated the stock option agreements by "act[ing] in concert with, and at the direction of, the Fund. Mr. Thomas and the Fund share a common motivation to inappropriately inflate the price at which Applied . . . repurchases Mr. Thomas's shares because Mr. Thomas has entered into a side agreement with the Fund and/or one or more of its general partners, under which any stock compensation awarded to Mr. Thomas . . . will be shared with the Fund and/or one or more of its general partners." In addition, the complaint alleged Thomas attempted to inflate the stock valuation because he was "obligated through a secret agreement with the Fund and/or one or more of its general partners to share any stock awards he received during his service as a director. Thus, the Fund is motivated to challenge the . . . valuation, as it would directly benefit from any increase in repurchase price paid by Applied . . . for the shares" under the stock option agreements.

The fraud cause of action in the SAC similarly alleges Thomas violated the stock option agreements by concealing "the existence of his secret agreement with the Fund that all of his . . . stock options and any proceeds thereof belonged to the Fund and its partners, not to Mr. Thomas individually." According to the SAC's aiding and abetting claim, Dennis "knew that Mr. Thomas was fraudulently concealing from Applied . . . the existence of his secret agreement to share the stock options" and "gave Mr. Thomas substantial assistance and encouragement" in concealing that "secret agreement." The breach of fiduciary duty cause of action in the SAC alleges Thomas breached his fiduciary obligations to Applied by "representing that he was acquiring stock options for his personal account . . . and by omitting the fact that he had a secret agreement with his partners at the Fund to share the ownership of all stock options granted by Applied[.]"

In applying the relation back doctrine, California's "courts should consider the 'strong policy in this state that cases should be decided on their merits.' " (*Pointe, supra,* 195 Cal.App.4th at p. 277.) Viewing these allegations in light of this policy, I would conclude the facts alleged in the SAC are "sufficiently similar" to those alleged in the

2

original complaint for purposes of the relation back doctrine.  (*Ibid.*, internal citations and fn. omitted; see also *Idding v. North Bay Construction Co.* (1995) 39 Cal.App.4th 1111, 1113 [relation back doctrine applies where "recovery is sought in both pleadings on the same general set of facts"].)  The fraud-based claims in the SAC undoubtedly add "a significant new dimension to the lawsuit" but the relation back doctrine "requires only that the original and amended pleadings seek recovery 'on the same general set of facts' [citation][.]"  (*Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 583–584 (*Grudt*) [negligence cause of action related back to wrongful death claim].)

The SAC "meet[s] that test."  (*Grudt, supra,* 2 Cal.3d at p. 584; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1199–1200 (*Amaral*) [new legal theories may relate back so long as they address the same set of facts]; *Weinstock v. Eissler* (1964) 224 Cal.App.2d 212, 234–235 (*Weinstock*) [fraud claim related back to allegation of negligent and intentional tort by a physician during an operation]; *Austin v. Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 602 [original and amended complaints "allege the same defalcations . . . with respect to plaintiffs' securities and moneys, and these defalcations constitute the grounds for the action on the bond added by the amended complaint"].)

To be sure, the relation back doctrine does "not apply if . . . 'the plaintiff seeks by amendment to recover upon a set of facts *entirely unrelated* to those pleaded in the original complaint.'  [Citation.]"  (*Pointe, supra,* 195 Cal.App.4th at p. 277, italics added.)  As discussed above, I do not read the SAC as alleging facts *entirely unrelated* to those in the original complaint.  Thomas's failure to honor the obligations he assumed when he agreed to the stock option plans and accepted the stock option awards under the stock option plans are central to plaintiffs' breach of contract and conversion claims and are central to their fraud-based claims.  That Thomas is alleged to have acted with a particular motivation—to conceal his side agreement and inflate the repurchase price and the price at which stock would be sold to the investing public to enrich himself and his IVP partners at the expense of Applied, to which he owed a fiduciary duty—does not

3

mean the facts giving rise to the fraud allegations are unrelated to the general facts giving rise to the breach of contract claims.

The majority states: [a]lthough both sets of claims relate to the stock options issued to Thomas [pursuant to a stock-sharing agreement], the claims rest on different sets of facts (2012 delay in stock repurchase vs. concealment of stock-sharing agreement starting in 2003), different injuries (loss of repurchase rights vs. undue issuance of stock options), and different instrumentalities (delay in returning stock assignment form vs. concealment of material facts regarding ownership of stock options)." The majority then details specific allegations in the original complaint and the absence of allegations of concealment of the stock-sharing agreement in that original complaint, and concludes the original complaint "provides[s] no factual basis for any element of the causes of action in the original complaint." In my view, the majority's new expression of the relation back doctrine is an "unduly rigid approach" (*Grudt, supra,* 2 Cal.3d at p. 585) which contravenes this state's policy that cases should be decided on the merits. (*Pointe, supra,* 195 Cal.App.4th at p. 277.)

"[A]n amendment seeking new damages relates back to the original complaint if such damages resulted from the same operative facts—i.e., the same misconduct and the same injury—previously complained of. [Citation.]" (*Amaral, supra,* 163 Cal.App.4th at p. 1200.) "In discussing the relation back of an amendment after the statute has run, courts have talked about the 'primary right' theory of a plaintiff's injury. [Citation.]" (*Rowland v. Superior Court* (1985) 171 Cal.App.3d 1214, 1217 (*Rowland*).) " 'The primary right theory . . . provides that a "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.]' [Citation.]" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 394.)

Here, the primary right violated is the same in the original complaint and the SAC: Thomas's misappropriation of stock options in violation of the stock option agreements and Applied's property interests, thereby causing monetary damages. (*Rowland, supra,* 171 Cal.App.3d at p. 1217 [same primary right where act for which plaintiff seeks

4

recovery "is the same"]; *Honig v. Financial Corp. of America* (1992) 6 Cal.App.4th 960, 966 [a "claim for different damages does not indicate there are different injuries. Rather, injuries may encompass the same primary rights"]; *Grudt, supra,* 2 Cal.3d at p. 584, quoting *Weinstock*, *supra*, 224 Cal.App.2d at p. 234 [primary right was "the same . . . although its statement now appears in terms of fraud"]; *McCoy v. Gustafson* (2009) 180 Cal.App.4th 56, 105 [under the primary rights doctrine, "the essence of a cause of action is the invasion of a plaintiff's primary right, not the number of acts and omissions that constitute the invasion"].)

The majority complains authority is lacking where relation back is applied to "sets of claims involv[ing] different injuries occurring years apart." I would counter that I am unaware of any authority supporting the proposition that a pleader will be denied the benefit of the relation back doctrine where the amended pleading alleges different items of damage suffered at different times or where the amended pleading alleges a different measure of damages under a new theory of liability, but asserts a violation of the same primary right arising from the same factual predicate. (See *Amaral, supra,* 163 Cal.App.4th at p. 1200 [an amendment seeking new damages based on new legal theory relates back to original complaint]; *Lamont v. Wolfe* (1983) 142 Cal.App.3d 375, 378 [wrongful death claim, which did not exist at time of filing of complaint because decedent was alive, related back; "it is the sameness of the facts rather than the rights or obligations arising from those facts that is determinative"].)

I would also conclude the original complaint and the SAC also involve the same instrumentality: Thomas's violation of the stock option agreements and that respondents had "adequate notice of the claim based on the original pleading." (*Pointe, supra,* 195 Cal.App.4th at p. 277.) Under "California's liberal pleading rules, '[l]ess particularity is required when it appears that defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues sufficient to enable preparation of a defense.' [Citations.]" (*Id.* at p. 278.) Here, this is particularly true because respondents were named in the original complaint. The original complaint provided sufficient information to permit respondents "to gather and preserve the relevant materials and begin to conduct

5

discovery and prepare a defense to the claims that were later refined and augmented in the [SAC]." (*Ibid.*; see also *Smeltzley v. Nicholson Mfg. Co.* (1977) 18 Cal.3d 932, 934–935 [relation back doctrine applied where the plaintiff added a new cause of action against a different defendant after the statute of limitations expired].)

Having concluded the fraud-based claims relate back to the original complaint, I would reach the merits of respondents' contentions challenging the bases for liability against IVP and Dennis.


_____

JONES, P. J.


A145867

6

Superior Court of San Mateo County, No. CIV519758, Hon. Elizabeth Lee, Judge.

Jones Day, Nathaniel P. Garrett, Richard J. Grabowski, and Meredith L. Williams, for Plaintiff and Appellant.

Keker & Van Ness, Susan J. Harriman, Matthew Werdegar, Kate E. Lazarus, Sophie Hood, for Defendants and Respondents.